JEWELL RIDGE COAL CORPORATION *v.* LOCAL NO. 6167, UNITED MINE WORKERS OF AMERICA ET AL.

No. 721.  Argued March 9, 1945.—Decided May 7, 1945.

*Messrs. William A. Stuart* and *George Richardson, Jr.* for petitioner.

*Mr. Crampton Harris,* with whom *Messrs. Welly K. Hopkins, Frank W. Rogers* and *Leonard Muse* were on the brief, for respondents.

*Messrs. Edward R. Burke* and *John C. Gall* filed a brief on behalf of the Southern Coal Producers Association, as *amicus curiae,* in support of petitioner.

*Solicitor General Fahy* and *Mr. Douglas B. Maggs* filed a brief on behalf of the Administrator of the Wage and Hour Division, U. S. Department of Labor, as *amicus curiae,* in support of respondents.

MR. JUSTICE MURPHY delivered the opinion of the Court.

In *Tennessee Coal Co.* v. *Muscoda Local,* 321 U. S. 590, this Court held that underground travel in iron ore mines constituted work and hence was included in the compensable workweek within the meaning of Section 7 (a) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 1063, 29 U. S. C. § 207 (a). The sole issue in this case is whether any different result must be reached as regards underground travel in bituminous coal mines.

The petitioner, Jewell Ridge Coal Corporation, owns two bituminous coal mines in Virginia. It instituted this declaratory judgment action against the respondent unions and certain of their officials, representing all of petitioner's underground mine workers. The respondents filed an answer and a counterclaim. By stipulation,

the parties sought to determine "what constitutes the working time which makes up the workweek of plaintiff's underground employees within the meaning of Section 7 of the Fair Labor Standards Act of 1938, and what amounts, if any, are due and unpaid to such employees under said Section, the determination of such amounts, if any, to be later referred to a special master." This issue relates only to the work performed by petitioner's underground miners between April 1, 1943, and June 20, 1943.

After hearing evidence and argument, the District Court concluded that petitioner had correctly computed the workweek on a "face to face" basis and that the Act did not require that the workweek include "either time spent by such employees outside the portal of the mines before entering therein, or time spent in traveling from the portals to their usual places of work and return." 53 F. Supp. 935, 952. Only the issue as to travel time is involved here. The Fourth Circuit Court of Appeals felt that the *Tennessee Coal* case, which was decided by this Court subsequent to the entry of the District Court's judgment in this proceeding, could not be distinguished in principle and accordingly reversed the judgment on that basis. 145 F. 2d 10.

We agree with the court below that there is no substantial factual or legal difference between this and the *Tennessee Coal* case and that underground travel in bituminous coal mines as well as in iron ore mines is included within the compensable workweek contemplated by § 7 (a) of the Fair Labor Standards Act.

Factually, underground travel between the portals and working faces of petitioner's two bituminous coal mines bears all the indicia of work. While the District Court here found "no such painful and burdensome conditions as those described in the iron ore mines," 53 F. Supp. at 949, all three of the essential elements of work as set forth

in the *Tennessee Coal* case, 321 U. S. at 598, are present in this instance:

1. *Physical or mental exertion (whether burdensome or not).* After arriving at petitioner's mines by foot or vehicle, the miners first obtain their lamps from the lamp house near the main portal. They then enter the man trips at the portal and are transported down to the underground man trip stations—a journey varying in distance from 4,250 feet to 25,460 feet. Each man trip is composed of a train of small empty coal cars drawn by an electric motor or locomotive. From seven to eight men sit on a bench or on the floor of each car, which is only a few feet high. The cars apparently are not overcrowded. If the roof of the passageway is sufficiently high the men are able to sit upright as they ride. But they must be on constant guard for the frequent low ceilings which force them to bend over to avoid striking their heads. And the dangers of falling slate and falling ceilings are ever present.

The District Court found that while this journey is "definitely not luxurious" it is "neither painful nor unduly uncomfortable, and is less hazardous than other phases of mining operations." In this connection it should be noted that the record shows that six persons suffered compensable injuries, involving absence from work for seven days or more, while riding on petitioner's man trips from January 1, 1939, to October 31, 1943. There is also evidence of two deaths and numerous minor injuries to the miners.

After arriving at the man trip stations, the miners check in at a nearby check-in board, a practice that differs inconsequentially from the procedure followed by the miners in the *Tennessee Coal* case of checking in at a tally house on the surface. They then collect their tools, equipment, explosives, etc., and carry them on foot to the working places, usually some 500 to 1,500 feet away. This requires that they proceed through dark and dangerous

tunnels, often so low as to force them to crouch over while carrying their burdens. Moreover, they must keep constant vigil against live electric wires, falling rocks and obstacles under foot. At the end of each shift, the miners make their return journey to the man trip stations, deposit their tools and equipment and ascend to the portal via the man trips.

In addition, approximately 72 men at petitioner's Jewell Ridge mine enter the mine at places other than the main portal and either catch the man trips at some man trip station inside the mine or walk all the way to their places of work.

These undisputed facts compel the conclusion that the underground travel in petitioner's mines involves physical and mental exertion. That it may not be so burdensome or disagreeable as some of the aspects of the travel described in the *Tennessee Coal* case is not of controlling significance in this respect.

2. *Exertion controlled or required by the employer.* It is obvious that the underground travel is both controlled and required by petitioner. Both the man trip transportation and travel by foot occur solely on petitioner's property and occur only as and when required by petitioner. Petitioner organizes, operates and supervises all aspects of the man trips. Definite schedules are arranged and maintained by petitioner. A company foreman rides on each man trip and occasionally gives work instructions during the journey. He also compels compliance with the numerous safety rules for man trips adopted by petitioner in compliance with state law. Layoff or discharge may result from a miner's continued failure to obey these rules.

3. *Exertion pursued necessarily and primarily for the benefit of the employer and his business.* It is too obvious to require extended discussion that here, as in the *Tennessee Coal* case, the underground travel is undertaken

necessarily and primarily for the benefit of petitioner and its coal mining operations. The miners do not engage in this travel for their own pleasure or convenience. It occurs only because it is a necessary prerequisite to the extraction of coal from the mines, which is the prime purpose of petitioner's business. Without such travel the coal could not be mined.

Thus the three basic elements of work of a type necessarily included within the workweek as contemplated by the Act are plainly evident from these facts. Those who are forced to travel in underground mines in order to earn their livelihood are unlike the ordinary traveler or the ordinary workman on his way to work. They must journey beneath the crust of the earth, far removed from the fresh and open air and from the beneficial rays of the sun. A heavy toll is exacted from those whose lot it is to ride and walk and mine beneath the surface. From the moment they enter the portal until they leave they are subjected to constant hazards and dangers; they are left begrimed and exhausted by their continuous physical and mental exertion.

To conclude that such subterraneous travel is not work is to ignore reality completely. We therefore are compelled to hold that the only reasonable conclusion to be drawn from the District Court's findings of fact and from other undisputed evidence is that the underground travel in petitioner's two mines is work and that the time spent in such travel should be included within the workweek for purposes of § 7 (a) of the Fair Labor Standards Act.

The other propositions advanced by petitioner are also answered by the principles of the *Tennessee Coal* case. Thus petitioner places heavy reliance upon the conclusion of the District Court that "by the universal custom and usage of the past fifty years, and by agreement of the parties in every collective bargaining agreement which was ever made, it was universally recognized that in the bituminous coal industry, travel time was not work time."

53 F. Supp. at 950. But even though the customs and contracts prevalent in this industry were to compute the workday only from the time spent "face to face" with the seams, we need only repeat what we said on this subject in the *Tennessee Coal* opinion, 321 U. S. at 602: "But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the workweek or not to compensate employees for certain portions of their work. The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him only for a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."

Such a conclusion is the only method of achieving the plain design of § 7 (a) to spread employment through imposing the overtime pay requirement on the employer and to compensate the employee for the burden of a workweek in excess of the hours fixed by the Act. *Walling* v. *Helmerich & Payne,* 323 U. S. 37, 40; *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 577, 578. This necessitates that the workweek be computed on the basis of the hours spent in actual work and that compensation be paid accordingly. And even those employers who pay wages above the minimum and who maintain no substandard working conditions must respect this statutory pattern. Conversely, employees are not to be deprived of the benefits of the Act simply because they are well paid or because they are represented by strong bargaining agents. This may in some instances require certain modifications and adjustments in existing customs and contracts in order to include all the hours actually worked in the statutory

workweek or to compensate at the proper rate for all of such labor. But if these modifications and adjustments are not made, the plain language and policy of § 7 (a) are frustrated.

Petitioner here has presented no cogent reason for legalizing such a frustration, however unintentional in character, of the statutory scheme. Statements in the legislative history to the effect that the Act was aimed primarily at overworked and underpaid workers and that the Act did not attempt to interfere with bona fide collective bargaining agreements are indecisive of the issue in the present case.[1] Such general remarks, when read fairly and in

---

[1] Thus, for example, the District Court relied in part upon a statement made by the Senator in charge of the original bill, which did not become law as it was then framed, to the effect that the bill did not affect collective agreements already made or hereafter to be made between employer and employee. 81 Cong. Rec. 7650. Aside from the fact that this statement was made with reference to entirely different provisions than those presently in the Act, a full and fair reading of the entire debate at the time in question demonstrates that the possibility of affecting or setting aside collective agreements when they did not coincide with statutory standards was definitely understood and appreciated. This is shown by the following remarks (81 Cong. Rec. 7650):

"Mr. WALSH. Next, does the bill affect collective-bargaining agreements already made or hereafter to be made between employers and employees?

"Mr. BLACK. It does not.

"Mr. WALSH. There is one exception to that, is there not? The bill does not affect collective-bargaining agreements where the hours are less than 40 per week, or where the wages are more than 40 cents per hour?

"Mr. BLACK. That is correct.

"Mr. WALSH. But if a collective-bargaining agreement has been entered into at 36 cents per hour wages, *the board would have jurisdiction to set that agreement aside* and to fix, if the facts warrant it, a minimum wage of 40 cents?" (Italics added.)

"Mr. BLACK. The board would have jurisdiction to do it, but under the provisions of the law it would be my judgment that the

light of their true context, were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire to allow the coal industry to use private customs and agreements as an excuse for failure to compute the workweek as contemplated by § 7 (a). In fact, some of these statements expressly recognize the necessity of modifying or setting aside those collective agreements that did not conform with statutory standards.[2]

Nor can we give weight to the fact that the Administrator of the Wage and Hour Division in 1940 issued a public statement that he would not regard the practice of computing working time on a "face to face" basis in the bituminous coal industry as unreasonable in light of the prevailing customs and practices, supported by a long history of bona fide collective bargaining. This statement, being legally untenable, lacks the usual respect to be accorded the Administrator's rulings, interpretations and opinions. Cf. *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140.

Moreover, as in the *Tennessee Coal* case, we are not concerned here with the use of bona fide contracts or customs

---

board would be very reluctant, indeed, to attempt to interfere with a bona-fide agreement made between employer and employee.

"Mr. WALSH. I think the Senator is correct; but the situation might well exist that the board, in fixing a minimum wage in a case where the wage of the employees was less than 40 cents, after a survey and study of the question, and taking into consideration some factors that it must take into consideration in fixing the wage, might decide, let us say, upon 38 cents per hour. If it is found that in some other industry of like character and nature there was a collective-bargaining agreement providing for the payment of 36 cents an hour it would, would it not, take jurisdiction and *set aside that collective-bargaining agreement insofar as the facts showed that 38 cents was a fair rate?*" (Italics added.)

"Mr. BLACK. It would."

[2] See note 1, *supra*.

to settle difficult and doubtful questions as to whether certain activity or nonactivity constitutes work. Cf. *Armour & Co.* v. *Wantock,* 323 U. S. 126. Nor do we make any intimations at this time concerning the validity of agreements whereby, in a bona fide attempt to avoid complex difficulties of computation, travel time is averaged or fixed at an arbitrary figure and underground miners are paid on that basis rather than according to their individual travel time.

We are dealing here solely with a set of facts that leaves no reasonable doubt that underground travel in petitioner's two bituminous coal mines partakes of the very essence of work.[3] This travel must therefore be included within the workweek for purposes of § 7 (a) of the Fair Labor Standards Act regardless of any custom or contract to the contrary at the time in question. Thus shall each of petitioner's miners receive his own reward according to his own labor.

*Affirmed.*

MR. JUSTICE JACKSON, dissenting.

The CHIEF JUSTICE, MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, and I are constrained respectfully to dissent from this decision because (1) It either invalidates collectively bargained agreements which govern the matter in difference between these parties or it ignores their explicit terms; (2) Neither invalidation nor disregard of collectively bargained agreements is authorized by any word of Congress, and legislative history gives convinc-

---

[3] Indeed, to the extent that petitioner's "face to face" collective bargaining agreements excluded travel time from the compensable workweek there was an implied recognition that underground travel was work and that such work would normally call for additional compensation in the absence of a specific "face to face" provision to the contrary. And the widespread practice in other coal producing nations of including travel time or portions thereof in the workday further bears out the conclusion that underground travel is work.

ing indications that Congress did not intend the Fair Labor Standards Act to interfere with them as this decision holds it does; (3) Congress withheld interference with collectively bargained contracts at the request of the United Mine Workers and expressed a policy to observe and preserve collectively bargained arrangements applying to the coal industry in other almost contemporaneous legislation specifically directed to the problems of that industry; (4) This decision is contrary to interpretations of the Act made by the Administrator upon the recommendation of the United Mine Workers, and it denies to the Administrator's rulings the respect we have been compelling lower courts to render to them in the cases of others; (5) The decision necessarily invalidates the basis on which the Government itself has operated the mines and brings into question the validity of the Government's strike settlement agreements and of all existing miners' agreements; (6) It proceeds on a principle which the Court has unanimously denied to unorganized workmen for whose benefit the Act was passed. It is the purpose of this opinion to set forth particulars supporting these grounds of dissent.

1. *The Court's decision either invalidates or ignores the explicit terms of collectively bargained agreements between these parties based on a half century of custom in the industry.* This action involves labor in two mines, each employing approximately five hundred men. At all times in issue the mines have been unionized and the workmen have been organized by the United Mine Workers of America. This union has been selected and recognized as the bargaining agent of the men. Their hours, wages, and working conditions have been fixed by collective bargaining.

Employees in these mines first were organized as members of the United Mine Workers of America in 1933, following promulgation of the N. I. R. A. Code of Fair Com-

petition for the industry. This code was drawn up by representatives of the Union and of the operators and was approved by the President of the United States. It provided for the "face to face" wage basis which makes no direct allowance for travel time, but, as has been pointed out on behalf of the Union, the wage scale was fixed at a level intended indirectly to compensate travel time. Basic wage agreements thereafter were entered into between the Union and the operators as of April 1, 1934 (continued in effect by successive extension agreements from March 31, 1935 until October 1935); again as of October 1, 1935; and as of April 2, 1937; again as of May 12, 1939, when the Fair Labor Standards Act was nearly a year old and had been in effect for nearly six months, a new agreement was bargained which, like all the previous wage agreements, expressly provided for the "face to face" basis, necessarily excluding all travel time from the workweek. The last basic wage agreement reached by collective bargaining previous to the commencement of this action, dated April 1, 1941 and to extend for a period of two years, did the same. These agreements are admitted and, if valid, govern the dispute between the parties.

But the Court does not honor these agreements. We have repeatedly and consistently held that collectively bargained agreements must be honored, even to the extent that employers may not, while they exist, negotiate with an individual employee or a minority, cf. *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, and must pay heavy penalties for violating them. Cf. *Order of Railroad Telegraphers* v. *Railway Express Agency,* 321 U. S. 342. And now at the first demand of employees the Court throws these agreements overboard, even intimating that to observe agreements, bargained long before enactment of the Fair Labor Standards Act, would be "legalizing" a frustration of the statutory scheme.

The suggestion that the agreements were "frustrations" of the statutory scheme has not the slightest warrant in this record. This "face to face" basis was traditional in the bituminous coal mining industry in this country and universally was the basis for determination of hours therein for something like half a century. This was contrary to the practice in England and Continental Europe, where the basis has been to calculate time from entry of the mine to leaving it or from "portal to portal" or some modification thereof. The reason American miners accepted this arrangement appears from an official statement by counsel for the United Mine Workers of America to the Administrator of this Act that "The uniform high rates of pay that have always been included in the wage agreement of the mining industry contemplate the employee's working day beginning when he arrives at his usual working place. Hence, travel time was never considered as a part of the agreement or obligation of the employer to pay for in this industry, nor as hours worked by the employees, and this has been the case since the eight-hour day was established in the industry—April 1, 1898," and "This method of measuring the working time at the place of work has been the standard provision in the basic wage agreements for almost fifty years and is the result of collective bargaining in its complete sense." [1]

The Court takes refuge in its own decision in *Tennessee Coal Co.* v. *Muscoda Local,* 321 U. S. 590, saying "We agree with the court below that there is no substantial factual or legal difference between this" case and that. But in the *Tennessee* case this Court pointed to facts of very different import saying, "Likewise there was substantial, if not conclusive, evidence that prior to 1938 petitioners [operators] recognized no independent labor unions and engaged in no bona fide collective bargaining with an eye toward reaching agreements on the workweek. Contracts with

---

[1] See letter of Houck set forth in Note 9.

company-dominated unions and discriminatory actions toward the independent unions are poor substitutes for 'contracts fairly arrived at through the process of collective bargaining.' The wage payments and work on a tonnage basis, as well as the contract provisions as to the workweek, were all dictated by petitioners [operators]. The futile efforts by the miners to secure at least partial compensation for their travel time and their dissatisfaction with existing arrangements, moreover, negative the conclusion that there was any real custom as to the workweek and compensation therefor." *Tennessee Coal Co.* v. *Muscoda Local, supra,* 601–2.

The Court does not contradict the Union's recognition that the contracts now disregarded by the Court were "contracts fairly arrived at through the process of collective bargaining." And that there is this important difference between the present situation and the situation that was before us in the *Tennessee* case was recognized by the counsel in the *Tennessee* case, the same counsel who argued this case at our bar. He had no difficulty in finding substantial factual and legal differences when he did not want the above-described situation in the *Tennessee* case to be prejudiced by being likened to this situation. The District Court quoted as "quite interesting" an excerpt from the argument made in the brief in that case: " 'We are not trying the case of coal miners. We are not experts on coal mining. We do know that there are two great differences between the coal mining situation and the mining of iron ore in Jefferson County. In coal mining we find a union which has been strong and powerful and which as a union has been engaged in collective bargaining with the coal operators over a long period of years. In our case we find the efforts of the men to organize their union presents a pitiable picture of helplessness against the domination of the mining companies. In coal mining the men work seven hours per day. At no point in the

voluminous record created by the appellants do we find a single ore mining company offering to pay its men on a seven hour day.' " [2]

We submit that there are substantial factual differences between these cases, and we therefore come to the question whether the presence in these cases of genuine collectively bargained contracts covering the matter in dispute has any legal significance. The Court thinks they mean nothing. We cannot agree.

2. *Neither invalidation nor disregard of collectively bargained agreements is authorized by the Fair Labor Standards Act. Both its legislative history and contemporaneous legislation are convincing that Congress did not itself intend to nullify them or to provide any legislative basis for this Court to do so.* It is admitted that the Act contains no express authority for this decision. As was said in *Tennessee Coal Co.* v. *Muscoda Local:* "In determining whether this underground travel constitutes compensable work or employment within the meaning of the Fair Labor Standards Act, we are not guided by any precise statutory definition of work or employment. Section 7 (a) [29 U. S. C. § 207] merely provides that no one, who is engaged in commerce or in the production of goods for commerce, shall be employed for a workweek longer than the prescribed hours unless compensation is paid for the excess hours at a rate not less than one and one-half

---

[2] 53 F. Supp. 935, 948. Similarly interesting arguments were presented to this Court in the brief which was submitted here in the *Tennessee* case: "The underground employees are not coal miners. They mine iron ore. We did not try out in the courts below the claims and counterclaims of the United Mine Workers of America and the coal operators. We do not see how we can try the issues between coal miners and coal operators on a record portraying the work, the environment and the detailed conditions in the iron mining industry. The judicial process applies to specific cases between designated parties. . . . The case, therefore, hinges on a matter of simple fact." (Respondents' Brief, pp. 28–29.)

times the regular rate. Section 3 (g) [29 U. S. C. § 203
(g)] defines the word 'employ' to include 'to suffer or
permit to work,' while § 3 (j) states that 'production'
includes 'any process or occupation necessary to . . . pro-
duction.' " [3]   This is every straw that can be picked from
the statute for the Court to grasp at.

Likewise, the Court is unable to cite any item of legis-
lative history which hints that Congress expected these
words to be given this meaning. On the other hand,
we find that pains were taken to assure Congress that there
was no such intent.

The bills which ultimately resulted in this Act were
introduced in 1937. As the District Court said, "Although
. . . statements were made at various times while the
measure was being amended and revised, and therefore
not with respect to the Bill in its final form, they show a
continuing intention not to interfere with the processes
of collective bargaining." [4]   Examples are multiple. The
Senate Committee on Education and Labor in its report
of July 6, 1937, said:

"The right of individual or collective employees to bar-
gain with their employers concerning wages and hours is
recognized and encouraged by this bill. It is not intended
that this law shall invade the right of employer and em-
ployee to fix their own contracts of employment, wherever
there can be any real, genuine bargaining between them.
It is only those low-wage and long-working-hour indus-
trial workers, who are the helpless victims of their own
bargaining weakness, that this bill seeks to assist to obtain
a minimum wage." (Senate Report No. 884, 75th Cong.,
1st Sess., pp. 3–4.)

The debates on the bill appear to us to make this inten-
tion more explicit. For example, the Congressional

---

[3] 321 U. S. 590, 597.
[4] 53 F. Supp. 935, 944.

Record, Vol. 81, p. 7650, shows that the following took place in debate in the Senate July 27, 1937:

"Mr. WALSH. Next, does the bill affect collective-bargaining agreements already made or hereafter to be made between employer and employee?

"Mr. BLACK. It does not."

Of course it was agreed on all hands that no agreement could be validly bargained which provided for less than the minimum wages to be fixed by the proposed Board or for more than the specified hours of labor. But beyond observance of these limitations, we read the legislative history to indicate that the control of wages, hours and working conditions by collective contract was left undisturbed.[5]

---

[5] The colloquy follows:

"Mr. WALSH. Next, does the bill affect collective-bargaining agreements already made or hereafter to be made between employers and employees?

"Mr. BLACK. It does not.

"Mr. WALSH. There is one exception to that, is there not? The bill does not affect collective-bargaining agreements where the hours are less than 40 per week, or where the wages are more than 40 cents per hour?

"Mr. BLACK. That is correct.

"Mr. WALSH. But if a collective-bargaining agreement has been entered into at 36 cents per hour wages, the board would have jurisdiction to set that agreement aside and to fix, if the facts warrant it, a minimum wage of 40 cents?

"Mr. BLACK. The board would have jurisdiction to do it, but under the provisions of the law it would be my judgment that the board would be very reluctant, indeed, to attempt to interfere with a bona-fide agreement made between employer and employee.

"Mr. WALSH. I think the Senator is correct; but the situation might well exist that the board, in fixing a minimum wage in a case where the wage of the employees was less than 40 cents, after a survey and study of the question, and taking into consideration some factors that it must take into consideration in fixing the wage, might decide, let us say, upon 38 cents per hour. If it is found that in some other industry

178

Definite assurances to that effect repeatedly given to the House are noted in the margin.[6] Nor are these assurances surprising or paradoxical.

of like character and nature there was a collective-bargainng agreement providing for the payment of 36 cents an hour it would, would it not, take jurisdiction and set aside that collective-bargaining agreement insofar as the facts showed that 38 cents was a fair rate?

"Mr. BLACK. It would." 81 Cong. Rec. 7650.

[6] The District Court summarized these as follows:

"Mrs. NORTON. . . . It is not the intention of this amendment, or of the bill, to start fixing wages in all industries but only in those in which oppressive wages are being paid to a substantial portion of workers . . ." (House, December 13, 1937, Congressional Record, Vol. 82, p. 1391.)

"Mr. RANDOLPH. . . . It [the bill] is not concerned with that fortunate majority of the laboring classes whose collective bargaining power is sufficiently potent to insure the preservation of their industrial rights.

"But it is concerned with those millions in industry who are unprotected and unorganized. . . ." (House, December 13, 1937, Congressional Record, Vol. 82, p. 1395.)

"Mr. CURLEY. . . . There is no conflict of jurisdiction, under the provisions of this fair standards of labor bill, and the existing labor organizations of this country. The bill concerns only of relieving the paralysis which, at present, shackles misery and poverty to millions of heads of families, who are underpaid and causing a colossal financial loss in purchasing power because of existing deplorable conditions." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7283.)

"Mr. BOILEAU. . . . What is more, we are preserving for organized labor its right to bargain collectively, and it will bargain for a higher wage than that." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7290.)

"Mr. ALLEN. . . . This bill has a threefold purpose as I see it. First, it eliminates sweat shops— . . . The bill does not affect organized labor, but those 5,000,000 American working men and women who have not yet been benefited by organized labor." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7291.)

"Mr. FITZGERALD. . . . I would have you observe that this proposed legislation will not improve the wages and hours of the majority of workers, nor does it attempt to. For I am greatly pleased to say that the majority of workers do not need this legislation because they

*3. Congress refrained from enacting authority for this result at the request of the United Mine Workers, expressed in the testimony of their responsible representatives, whose plan for regulating the coal industry was enacted in the Guffey Coal Act.* In 1937, bills which ultimately resulted in the Fair Labor Standards Act were introduced in both houses of Congress and hearings were held. Major Percy Tetlow, an official of the International Union, United Mine Workers of America, as a witness in this case, summarized the attitude of the mine workers as follows:

"No, the Miners' organization has always taken the position that the question of wages, hours and conditions of employment should be governed and controlled by agreements under collective bargaining in the industry more so than by legislation. We have always taken the position that any legislation which will improve standards of working men and women,—to favor it and foster it and support it. Fundamentally, we are opposed to legislation that controls the daily wage and conditions of employment. We think that is a relationship that should exist between employer and employee." This is in accord with the testimony of Mr. John L. Lewis, President of the United Mine Workers of America, before the congressional committees, when he said:

"For instance, frankly I would not want this bill to convey power to a board to order an investigation into all of the wage agreements in the mining industry right now, or to give the board power to decide that the collective-bargaining agreements in the mining industry were not sound, not proper; were confiscatory, or not in harmony with the facts of the industry, and order a modification thereof. I think the power of the board should be limited

---

are receiving a living wage and are not forced to work unreasonable hours." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7310.)

to cases which run below the level of the standards fixed by Congress. I see endless confusion in the adoption of section 5 now. I see a drift toward the complete fixation of wages in all industry by governmental action." [7]

Far from interfering with employer-employee agreements by this Act, the United Mine Workers advocated and Congress enacted contemporaneous specific legislation to confirm them in the coal industry. The same Congress which enacted the Fair Labor Standards Act of 1938 enacted the second Bituminous Coal Act of 1937, (50 Stat. 72, Chap. 127, 15 U. S. C. § 828), which states that

"(a) . . . It is hereby declared to be the public policy of the United States that—

(1)⁻ Employees of producers of coal shall have the right to organize and to bargain collectively with respect to their hours of labor, wages, and working conditions through representatives of their own choosing, without restraint, coercion, or interference on the part of the producers." 15 U. S. C. § 839.

It is impossible to believe that Congress in April of 1937 wrote such a specific declaration in favor of collective bargaining and a short time later by general phrases of the Fair Labor Standards Act intended to invalidate or disregard collective bargaining.

It may safely be said that over the past half century Congress has given more detailed and specific consideration to the bituminous coal mining industry than to any other single industry with the possible exception of transportation. The efforts of Congress, the travail of mine labor, and the difficulties of operators are recited in this case and in extensive briefs by the Government and parties interested in the coal mine litigations that have been considered here. Cf. *Appalachian Coals* v. *United States,* 288

---

[7] Joint Hearings before the Committee on Education and Labor, United States Senate and the Committee on Labor, House of Representatives, June 2–22, 1937 (75th Cong., 1st Sess.) p. 281.

U. S. 344; *Carter* v. *Carter Coal Co.,* 298 U. S. 238; *Sunshine Anthracite Co.* v. *Adkins,* 310 U. S. 381. In the twenty-three years between 1913 and 1935 when the first Bituminous Coal Conservation Act was passed there were no less than nineteen investigations and hearings by congressional committees or specially created commissions with respect to conditions in this industry which were of grave national concern. These investigations had dealt with bitterly contested strikes, and with serious disorders which frequently resulted in bloodshed and martial law, and which on at least four occasions were restrained by intervention of federal troops. Other investigations were concerned with coal shortages and high prices and with the demoralization of the industry. The plight of this industry at that time was graphically summarized by Mr. Justice Douglas in *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381, for an all but unanimous Court: "For a generation there have been various manifestations of incessant demand for federal intervention in the coal industry. The investigations preceding the 1935 and 1937 Acts are replete with an exposition of the conditions which have beset that industry. Official and private records give eloquent testimony to the statements of Mr. Justice Cardozo in the *Carter* case (p. 330) that free competition had been 'degraded into anarchy' in the bituminous coal industry. Overproduction and savage, competitive warfare wasted the industry. Labor and capital alike were the victims. Financial distress among operators and acute poverty among miners prevailed even during periods of general prosperity. This history of the bituminous coal industry is written in blood as well as in ink.

"It was the judgment of Congress that price-fixing and the elimination of unfair competitive practices were appropriate methods for prevention of the financial ruin, low wages, poor working conditions, strikes, and disruption of the channels of trade which followed in the wake

of the demoralized price structures in this industry. If
the strategic character of this industry in our economy and
the chaotic conditions which have prevailed in it do not
justify legislation, it is difficult to imagine what would."[8]

It was against this economic background so well known
to Congress that the plan for stabilization of the bitumi-
nous coal industry, through elimination of "competitive
warfare" was adopted in the interests both of labor and
the operators. In the light of the sustained attention
Congress had given to the delicate economy of the coal
industry and its plan to stabilize it by collective bargaining
and price-fixing, it is unbelievable that it would undo a
substantial part of that plan by the casual and ambiguous
implication which the Court now attributes to the Fair
Labor Standards Act.

4. *The decision of the Court is contrary to the interpre-
tations of the Act made by its Administrator on the recom-
mendation of the United Mine Workers, and it denies to
the Administrator's rulings the respect we have been
compelling lower courts to render to such administrative
rulings in the cases of others.* It was not until 1940 that
anyone appears to have thought the Act affected the coal
miners' agreements. In the year 1940, an investigator
of the Wage and Hour Administration, investigating
operations of a coal mining company in Pennsylvania,
raised the question whether underground travel time must
be included in the workweek under the terms of the Act.
He stated his opinion that the "face to face" basis, exclud-
ing travel time, was the proper one to be applied in the
coal-mining industry, but indicated that if a rule thereto-
fore applied in the case of a gold mining company were
required the coal company would owe some $70,000 to
underground workers. This was brought to the attention
of the President of the Central Pennsylvania Coal Pro-

[8] 310 U. S. 395.

ducers Association, and he in turn brought it to the attention of other operators and of Mr. Lewis, President of the International Union, United Mine Workers of America. Thereafter representatives of both the operators and the United Mine Workers conferred from time to time with the representatives of the Wage and Hour Administration. Both the operators and the Union officials opposed any construction of the Act which would require payment for travel time.   On July 9, 1940, representatives of the operators and Mr. Earl Houck, director of the legal department of the United Mine Workers of America, jointly composed and sent to the Administrator of the Wage and Hour Division a letter setting out their views on the subject.[9]   They urged that such a change "would create so

[9] The letter appears in the opinion of the district court:

1617 PENNSYLVANIA BOULEVARD,
*Philadelphia, Pennsylvania, July 9, 1940.*

Col. PHILIP B. FLEMING,
*Administrator, Wage and Hour Division,*
*Department of Labor, Washington, D. C.*

DEAR MR. ADMINISTRATOR: As a result of certain investigations which have been conducted by the Wage & Hour Division at bituminous coal mines in Pennsylvania, particularly at the Revloc shaft of the Monroe Coal Mining Company, and a conference that has been held by your Supervising Inspector, Mr. Caffey, at Pittsburgh, Pa., with a committee of the Western Pennsylvania Coal Operators' Association, concerning the application of the Fair Labor Standards Act to the bituminous coal mining industry, certain questions have arisen that are disturbing to both employers and employees within the industry.   These uncertainties have been continuing for some time and are causing much concern to the mine workers and the mine operators, especially with reference to "travel time."

Today, the Negotiating Committee of the Appalachian Wage Conference, namely: Messrs. J. D. A. Morrow, President of Pittsburgh Coal Company; L. T. Putnam of the Raleigh Wyoming Mining Company, Beckley, W. Va.; L. C. Gunter, of the Southern Appalachian Coal Operators' Association, Knoxville, Tenn.; Charles O'Neill, President of the United Eastern Coal Sales Corporation, New York City; C. E. Cowan, Vice President of Monroe Coal Mining Company; Frederick

much confusion in the bituminous industry as to result in complete chaos, and would probably result in a complete stoppage of work at practically all of the coal mines

H. Knight, counsel for Monroe Coal Mining Company; W. L. Robison, President of the Youghiogheny & Ohio Coal Company and Chairman of the Appalachian Wage Conference, on the one hand, and Mr. Earl E. Houck, Director of the Legal Department of the United Mine Workers of America, met with Mr. Dorsey, Regional Director, Philadelphia, Pa., and Mr. Gallagher, Regional Counsel, Philadelphia, Pa., at which time these questions were discussed at length, particularly the application of the Act as to the question of hours of work in the bituminous coal industry.

The mine workers and the mine operators present presented their views to representatives of the Wage and Hour Division as to the provisions of the Appalachian Wage Agreement covering maximum hours and working time. We have filed with the Division copy of the Appalachian Wage Agreement, and the entire provision as to maximum hours and working time is included therein. The pertinent language, however, is "Seven hours of labor shall constitute a day's work. The seven-hour day means seven hours' work in the mines at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid by the day or be paid on the tonnage basis . . ." The Appalachian Wage Agreement is the basic agreement for the bituminous mines in the States of Pennsylvania, Ohio, West Virginia, Virginia, Eastern Kentucky, Southeastern Tennessee and Maryland. In this territory there are several thousand rail shipping mines employing from 300,000 to 325,000 men, and some twenty-three operating districts. Each of the districts work out a local wage agreement covering its own territory, subject, however, to the provision that it must include within it all of the provisions of the Appalachian Agreement. The mines in the Appalachian region produce 70% of the total bituminous coal produced in the United States annually. Also, the Appalachian Agreement is used by the United Mine Workers of America as the basic agreement upon which the district agreements of the remaining 30% of the country is predicated.

The United Mine Workers of America and coal operators of the United States have been negotiating wage agreements for a period of fifty years. The Appalachian Agreement, covering as it does a great number of men and mines, has been worked out over that period of time and covers within its general provisions myriad wage rates, conditions of work, and hours of employment. This agreement, with its

in the United States. Such a ruling, moreover, would establish such diversity of time actually spent at productive work as between different bituminous coal mines and

twenty-three supplemental agreements, constitutes a whole document. In those conferences, of course, hours of work has been one of the principal matters of consideration during this period of time. Hours of work with wage rates constitute the heart of any such agreement. In this basic industry we have provided for seven-hour days, five-day weeks, thirty-five hours per week, with high rates of pay. The basic inside day rate in the North is $.857 per hour, and in the south it is $.80 per hour. The underground workers are paid on this basis with maximum rates for mobile loading machine operators, approximately $1.09 per hour. In addition, the agreement provides, "work by mine workers paid by hour or day in excess of seven hours in one day, or thirty-five hours in any one week, shall be paid for it at the rate of time and one-half . . ." It is our opinion that these substantive provisions of the agreement are among the highest standards of labor provided in any industry in the United States, both as to hours of working time and as to wages paid. There is full and complete understanding in the industry between employer and employees as to the application of these provisions. This method of measuring the working time at the place of work has been the standard provision in the basic wage agreements for almost fifty years and is the result of collective bargaining in its complete sense.

There are many reasons why the provision as to working time has been set out as provided by this agreement. The impracticability of measuring time by any other method is inherent in the very nature of mining coal. Coal mines are sometimes very extensive. When they are first opened up, the working places are, of course, close by and near to the opening of the mine. In such cases there is no problem of either transportation of the men, to the working places or time consumed in reaching them; but as mines grow older, the working places move farther and farther away from the portal or opening of the mine, and as such conditions develop, it becomes necessary for provision to be made for transportation of the men over long distances to their working places. This is usually provided by what is known in the industry as "man trips." These trips are scheduled to leave the outside or opening of the mine at a certain hour, so that all the employees will reach their working places by the hour at which work regularly begins at the working places throughout the mine, and these trips are also scheduled to leave the inside of the mine when the day's work

within each mine that there would be no basis on which
any general wage scales could be predicated, collective bar-
gaining would therefore be rendered impossible through-

---

is done, at the conclusion of the seven-hour period of work at the
working places. Among other provisions of the agreement, there is
provided a time for starting the day's work and a lunch period, as well
as a time for expiration of the work day. There is some variation in
this, depending upon local conditions as to the starting and quitting
time at the various collieries. The agreement provides for a certain
tolerance. In any event, the starting and quitting time are no more
than seven hours apart, exclusive of the lunch period.

In the many conferences that have been held over this period of
fifty years, naturally all manner of suggestions and proposals for
amplification or amendment of the agreement has been made both by
the mine workers and the operators.

The uniform high rates of pay that have always been included in
the wage agreement of the mining industry contemplate the em-
ployee's working day beginning when he arrives at his usual working
place. Hence, travel time was never considered as a part of the
agreement or obligation of the employer to pay for in this industry,
nor as hours worked by the employees, and this has been the case
since the eight-hour day was established in the industry—April 1,
1898.

It is urged that any ruling requiring such a change in the custom,
tradition and contract provision so as to change the work day
from "seven hours' work in the mines at the usual working places"
to any new standard for the measurement of time worked, and to the
adjustment of wage rates made necessary thereby, would create so
much confusion in the bituminous industry as to result in complete
chaos, and would probably result in a complete stoppage of work
at practically all of the coal mines in the United States. Such a
ruling, moreover, would establish such diversity of time actually
spent at productive work as between different bituminous coal mines
and within each mine that there would be no basis on which any
general wage scales could be predicated, collective bargaining would
therefore be rendered impossible throughout this industry, and the
very purpose of the Fair Labor Standards Act would be defeated.
In such an event, it would make necessary the reassembling of the
Appalachian Joint Wage Conference and it would be faced with an
issue that would be almost impossible of solution by agreement, result-
ing in an industrial conflict that could paralyze the nation. This

out this industry, and the very purpose of the Fair Labor Standards Act would be defeated." In response to the joint representations and recommendation of both oper-

would be a most unhappy result to flow from an act that was passed by the Congress to aid workers in industries that had unreasonably long hours and unreasonably low rates of pay, as contrasted with the short hours and the high rates of pay in the bituminous coal mines. The great amount of money involved in the case of extra payment by the operators or the great changes that would be required in the rates of pay to the miners, should any change in the present contract be necessary by reason of a new standard for the measurement of time worked, is so serious that a negotiated adjustment would seem to be impossible.

For the foregoing reasons, we believe that your Division should accept the standards of wages and hours of work, and the definition of working time, as set forth in the Appalachian Agreement (which embodies the custom and traditions of the bituminous mining industry), as complying both with the provisions of the Fair Labor Standards Act and of Interpretive Bulletin No. 13, to the effect that "reasonable standards agreed upon between the employer and the employee will be accepted for the purposes of the Act."

We therefore respectfully request that your Division issue a supplement to interpretive Bulletin No. 13, stating that the standard of wages and hours of work, and definition of working time, set forth in the Appalachian Agreement, entered into on May 12, 1940, between twenty-three district associations of bituminous coal operators comprising the Appalachian coal producing area and the International Union, United Mine Workers of America, and the several district agreements based thereon, conform to and satisfy the requirements of the Wage & Hour Act.

Respectfully submitted.

For the United Mine Workers of America:

[S] Earl E. Houck,
*Director of the Legal Department.*

For the Operators:

[S] W. L. Robison, *Chairman,*
[S] Charles O'Neill,
[S] L. T. Putnam,
[S] L. C. Gunter,
[S] J. D. A. Morrow,
*Appalachian Joint Conference Negotiating Committee.*

ators and the United Mine Workers, the Administrator, July 18, 1940, ruled that "working time on a 'face to face' basis in the bituminous coal mining industry would not be unreasonable." [10] We have admonished lower courts that they must give heed to these interpretations. *Armour & Co.* v. *Wantock*, 323 U. S. 126; *Skidmore* v. *Swift & Co.*, 323 U. S. 134. The District Court in this case did so, only to find them brushed aside here as of no importance.

5. *This decision necessarily invalidates the basis on which the Government in operating the mines contracted with the miners and brings into question the validity of all the existing mine agreements.* It appears to have been wartime restrictions on flat wage increases which finally led the United Mine Workers to reverse their former and to take their present position. It was not until the wage conference of 1943 that the United Mine Workers for the first time demanded that "To conform with the basic and legal requirement for the industry, the maximum hours and working time provisions be amended to establish portal to portal for starting and quitting time for all underground workers." [11] But this condition was to be satisfied by a flat wage increase for all mine workers, whether or not they spent any time traveling underground, and was not to be based on each individual worker's actual travel time, as the Court now holds the Act requires. The evolution of the Union's present demands is traceable through the sequence of events.

This March 1943 Wage Conference fell into dispute. The case was certified on April 22, 1943 to the National War Labor Board. The parties agreed after request by President Roosevelt to extend the 1941 agreement to May 1. The National War Labor Board on April 24, 1943 directed them, pending decision, to continue work under

---

[10] 3 Wage and Hour Rep. 332, 333.
[11] 53 F. Supp. 941.

the previous terms. When May 1st came around, however, the miners went on strike, the Government seized the mines, and the strike came to an end May 6, under a temporary arrangement extending the old contract to May 31. On May 14, the Board directed the Wage Conference to resume negotiations. This reconvened and negotiations continued until June 20. However, when the extension agreement expired on May 31, a second strike began. On June 3, President Roosevelt appealed to the miners to return to work, and they did so after the President of the Mine Workers ordered them to resume until June 20. On that day there was a third strike, which lasted three days, when it was terminated on appeal by President Roosevelt, the Union again directing the miners to resume work until October 31. The conferences did not agree and the controversy went again to the National War Labor Board.

The Board found as follows: "The Mine Workers' demand of $2.00 a day was . . . based upon an assumption or estimate that the travel time amounted on the average to an hour and one-half a day. . . . The United Mine Workers proposed to spread this amount over all the workers including those who did not go underground, and so arrived at the proposed general wage increase of $2.00 for all mine workers. . . . It is obvious that these figures are out of all proportion to any amount that could possibly be due to the mine workers under the Fair Labor Standards Act, even if the courts should decide all questions in controversy in favor of the mine workers. The demand is plainly and unmistakably a demand for an 'indirect wage increase in violation of the wage stabilization policies,' contrary to the Board's directive order of May 25, 1943." [12] And in a release on June 18, 1943, the Board said: ". . . The United Mine Workers have not proposed to change the 'face to face' basis of payment. On

[12] 9 War Lab. Rep. 118.

the contrary they have proposed merely to increase the hourly rate under the present contract system. . . . It would not be in fact payment to the mine workers for portal to portal. It is merely a general wage increase supported by the argument that the mine workers . . . think they ought to have a general wage increase because on the average they will spend a certain amount of time in travel."

Finding itself thus frustrated in its demand for a flat wage increase, the Union then negotiated with the Illinois Coal Operators' Association an agreement which provided for a $1.25 increase for each working day. The National War Labor Board refused to approve this as also violative of the national wage stabilization program. It was then, and apparently because it afforded the only means of obtaining an increase that did not conflict with the wage stabilization program, that the Mine Workers negotiated the second Illinois Agreement, dated September 23, 1943, of which the National War Labor Board said: "The Illinois Agreement now submitted to the Board presents for the first time a true portal-to-portal method of compensation for the mine workers. The 1941–1943 contract provides for a seven-hour day and 35-hour week of productive time at the working face, excluding travel time. . . . The Illinois Agreement proposes to substitute for this method of compensation an 8½-hour day inclusive of travel time, with payment at straight time rates for the 8½ hours and overtime payment at rate and one-half for all time beyond 40 hours a week." [18]   The Board found that the effect of this was an increase which it could not wholly approve.

Meantime the Government had taken over the mines and on November 3, 1943, the Ickes-Lewis agreement was made. The method of wage calculation under the Ickes-Lewis agreement was to treat each employee as having

[18] 11 War Lab. Rep. 687.

forty-five minutes of travel time, irrespective of his actual travel time. The War Labor Board on November 5, 1943 approved the Ickes-Lewis agreement, and thus in effect granted a flat wage increase, uniform for all miners irrespective of their individual actual travel time.

The testimony in this case closed on November 24, 1943 with the mines still in the hands of the Government. The Government's policy, however, was not to return the mines until an operating agreement could be reached and approved by the miners and the operators. The operators by collective bargaining reached agreements which followed the provisions of the Ickes-Lewis agreement, the mines were returned, and this uniform method continues in use as a result of collective bargaining.

It is important to observe that, while there has thus been introduced a change in the method of computing working time, it by no means complies with and did not purport to be adopted because of the requirements of the Fair Labor Standards Act as now interpreted by this Court. If it is illegal for the operators and the miners by collective bargaining to agree that there shall be no travel time, it is obviously equally illegal to agree that the travel time shall be fixed at an arbitrary figure which does not conform to the facts. That the assumption of forty-five minutes of travel is an unfounded one is evident from the record in this case, which indicates that the average daily travel time in one of the petitioner's mines is eighty-eight minutes; and in the other, 67.1 minutes. If United Mine Workers' agreements are ineffective to make all of this time non-working time, how can they be effective to make half of it non-working time? Moreover, the averaging means that a part of the travel time earned by one miner is taken away from him and given to another who has earned less than the average, a procedure utterly unwarranted in the statute, if the statute applies at all. If the Fair Labor Standards Act entitles each individual

miner to travel time, not according to the terms of his collectively bargained agreements, but according to the time actually spent, as the Court now holds, these Government agreements violated that law, the present agreements do also, and heavy liabilities both for overtime and penalties are daily being incurred by the entire industry.

6. *This decision proceeds on a principle denied to unorganized workmen for whose benefit the Act was passed.* The ink is hardly dry on this Court's pronouncement, in which all of the majority in this case joined, that: "The legislative debates indicate that the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 707, n. 18. That coat ill fits the United Mine Workers. But let us contrast the advantage which this decision extends to a powerful group so plainly outside of the policy of the Act with the treatment of groups that, being unprotected and unorganized, were clearly within it.

Little more than six months ago this Court unanimously remanded to the lower courts for trial and findings on the facts a case involving night waiting time of seven unorganized firemen. It said that "We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. . . . This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. . . . The

law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 136–37. That was in keeping with other holdings. Cf. *Armour & Co.* v. *Wantock*, 323 U. S. 126, 132–3.

Now comes this case involving the organized miners, and the Court holds that ". . . we are not concerned here with the use of bona fide contracts or customs to settle difficult and doubtful questions as to whether certain activity or nonactivity constitutes work." It is held in this case that the time must be counted "regardless of any custom or contract to the contrary at the time in question." Can it be that this sudden refusal to weigh the facts is because as found by the District Court on almost undisputed evidence they are so decisively against the conclusion the Court is reaching? *Jewell Ridge Coal Corp.* v. *Local No. 6167, United Mine Workers*, 53 F. Supp. 935. This was made plain also by the Circuit Court of Appeals, which said:

"In view of the long established custom in the coal industry not to include travel time in the work week, the collective bargaining contracts extending over a long period recognizing the 'face to face' basis of pay, the testimony before the committees of Congress, the reason and purpose of the Fair Labor Standards Act . . . and the probable effects and consequences of construing the act to require travel time in bituminous coal mines to be included in the work week, there is strong reason for thinking, as everyone connected with the matter seems to have thought until recently, that it was not the intent of Congress that the act should be so construed in its application to the coal mining industry. The reasons in support of this conclusion are fully and ably set forth in the opinion of the learned judge below and need not be repeated. They would be convincing, were it not for the decision of the Supreme Court in *Tennessee Coal, Iron & R. Co.* v.

*Muscoda Local No. 123, etc.,* 321 U. S. 590, 64 S. Ct. 698, 703, which we do not think can be distinguished in principle from the case at bar." And it added, "Under the circumstances, there is nothing for us to do but reverse the decision below. If it is thought that the decision of the Supreme Court should be overruled or limited so as not to apply to a case of this character, that is a matter for the Supreme Court and not for us." *Local No. 6167, United Mine Workers* v. *Jewell Ridge Coal Corp.,* 145 F. 2d 10, 11, 13.

The Court now says *Tennessee Coal Co.* v. *Muscoda* is a precedent which controls this case and "that there is no substantial factual or legal difference between this and the *Tennessee Coal* case." That can be said only because the Court declines to look at the record of factual differences, casts them out as being immaterial. The fact is that the *Tennessee* case differed from this as night does from day. Two courts below had decided the vital facts in that case in the miners' favor. One court below has found the facts in this case against them, and the other agrees that its findings are convincing. The Court now declines to appraise the factual difference of this case and holds that this case was decided, although not before us, by the *Tennessee* case opinion, regardless of any variation of facts. This, too, although we have unanimously replied to one litigant who sought the benefit of statements therein that "The context of the language cited from the *Tennessee Coal* case should be sufficient to indicate that the quoted phrases were not intended as a limitation on the Act, and have no necessary application to other states of facts." *Armour & Co.* v. *Wantock,* 323 U. S. 126, 133. We ought not to play fast and loose with the basic implications of this Act.

The "face to face" method, whatever its other defects, is a method by which both operators and miners have tried to bring about uniformity of labor costs in the different

unionized mines and to remove the operator's resistance to improved wage scales based on fear of competition. Under this decision there can be no uniform wage in this industry except by disregarding the very duty which this decision creates to pay each miner for his actual travel time. Thus, two men working shoulder to shoulder, but entering the mine at different portals must receive either different amounts of pay in their envelopes or must stay at their productive work a different length of time. Thus, too, old mines which have burrowed far from their portals must shoulder greatly increased labor cost per ton. The differential may be sufficient to make successful operation of some of the older mines impossible. Mining labor has tended to locate its dwellings near its work, and the closing of mines results in corresponding dislocations of mining labor. These are the considerations, so fully set forth in the Houck letter to the Administrator, which the Court is disregarding.

We can not shut our eyes to the consequence of this decision which is to impair for all organized labor the credit of collective bargaining, the only means left by which there could be a reliable settlement of marginal questions concerning hours of work or compensation. We have just held that the individual workman is deprived of power to settle such questions. *Brooklyn Savings Bank* v. *O'Neil; Dize* v. *Maddrix,* 324 U. S. 697. Now we hold collective bargaining incompetent to do so. It is hard to see how the long-range interests of labor itself are advanced by a holding that there is no mode by which it may bind itself to any specified future conduct, however fairly bargained. A genuinely collectively bargained agreement as to wages, hours or working conditions is not invalidated or superseded by this Act and both employer and employee should be able to make and rely upon them, and the courts in deciding such cases should honor them.

196

We doubt if one can find in the long line of criticized cases one in which the Court has made a more extreme exertion of power or one so little supported or explained by either the statute or the record in the case. Power should answer to reason none the less because its fiat is beyond appeal.