**BATTERY WORKERS' UNION LOCAL 113, UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, C.I.O., v. ELECTRIC STORAGE BATTERY CO.**
Civ. A. 6162.

District Court, E. D. Pennsylvania.
Jan. 30, 1948.

948

M. H. Goldstein, of Philadelphia, Pa., for plaintiff.

Lewis H. Van Dusen, Jr., of Drinker, Biddle & Reath, all of Philadelphia, Pa., for defendant

KIRKPATRICK, District Judge.

This suit is brought by the plaintiff Union in behalf of 96 employees, guards at the defendant's plant, to recover overtime pay alleged to be due under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The case was tried to the court and a jury, and a special verdict consisting of answers to nine specific questions, was returned. Both the plaintiff and the defendant have moved for judgment.

Certain facts are either uncontroverted or established by credible and uncontradicted testimony and are as follows:

The guards fall into two main categories, (a) guards who did not relieve other guards but made rounds of the plant, (b) guards who relieved other guards on fixed posts. There were also a few guards who did both in the course of one shift but they need not be dealt with in any separate category.

Guard duty at the defendant's plant was, except in a very few instances, organized on the basis of three separate eight-hour shifts beginning respectively at 8 A.M. (A shift), 4 P.M. (B shift), and 12 P.M. (C shift). All the guards were required to wear, while on duty, uniforms owned and provided by the defendant.

Taking first the guards who did not relieve other guards, it was the general practice for them to arrive at the plant about 15 minutes before the hours when their respective shifts began. As soon as they got there they punched the time clock and then proceeded to the locker room to change into uniform after which they reported to the guard captain's office to pick up guns (during such time as guns were carried) and watchman's clocks and from there went to the points where their respective rounds began, arriving at such points not later than the hour at which the shift began. These points varied in distance from the locker room from about 100 yards to four city blocks. These guards, in most instances, were able to finish their

tours of duty somewhat in advance of the end of the shift. On doing so they returned to the locker room, washed, changed into civilian clothes and then punched out. If any of them punched out before the end of the shift a deduction would be made from his pay.

The guards who relieved other guards at fixed posts customarily arrived at the plant 20 to 30 minutes before the beginning of the shift. In order to simplify this part of the statement, we may take as an example a guard on the B shift, it being understood that substantially all the guards who relieved other guards followed the same general routine. Upon arrival at, say, 3:30 he punched the time clock, changed into uniform in the locker room, went to the office of the captain of the guards, picked up a revolver, received instructions, if any, and then proceeded to a designated post to relieve the guard there on duty. He usually arrived at the post 15 minutes in advance of the hour at which the shift was to begin, which would bring him there at 3:45. When he arrived, the guard there on duty for the preceding shift left the post and returned to the locker room. The guard who had arrived took up the same duties as were being performed by his predecessor. He checked the passes of incoming employees and protected the property of the defendant; and if at a gate, he checked vehicles in and out of the plant. During the first 15 minutes he performed functions identical with those he performed throughout the balance of his shift. Thus, in the ordinary case, he would be on the post, performing guard duty in the most restricted sense of that term, at 3:45 and would continue performing such duty until 11:45 when a guard on the C shift arrived to relieve him, whereupon he would return to the locker room, wash, change his uniform and punch out. If he left the company premises or punched out prior to the end of his shift (12 o'clock) he would be docked.

All the foregoing facts and the practices described were known to and acquiesced in by the defendant at all relevant times. In January, 1945, the defendant informed the plaintiff Union that the giving of relief was "a matter of courtesy among the guards" but did not order the practice discontinued. In July, 1946, the defendant posted notices to the effect that the guards might take the uniforms home.

The mere fact that a guard was at the defendant's plant or on the premises, after punching in, for more than 40 hours in any week (or in terms of a 5 day week, more than 8 hours per day) does not entitle him to overtime pay. Under the Fair Labor Standards Act, overtime for which claim is made must be devoted to work. Moreover, since the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq., regardless of the fact that the activities may constitute work under the Fair Labor Standards Act, the employer is required to pay overtime for only such of them as were compensable by either express contract or by custom or practice.

In the present case the plaintiff's claim for overtime as to each guard is made up by aggregating three different kinds of activities: (1) "On guard" duties—standing at a fixed post or making rounds through the plant—(2) changing into and out of uniform, (3) reporting to the captain's office to pick up equipment and receive instructions, walking to and from the post, turning in equipment and waiting in the locker room to punch out at the end of the shift.

As to (1), there can be no question that the time spent on posts and on rounds is work within the Fair Labor Standards Act and is chargeable to the employer under the Portal-to-Portal Act.

As to (2), one of the issues submitted to the jury for its special verdict was, "Were the guards engaged in work when they were changing into and out of uniform?" The jury answered "No". In view of this answer no claim could be based upon this activity, entirely apart from the provisions of the Portal-to-Portal Act and even if the Fair Labor Standards Act were the only statute involved. The Supreme Court has held that the question whether an activity is work or not, within the meaning of the Fair Labor Standards Act, is one of fact to be determined by the trier of the facts. Tennessee Coal, Iron & R. Co. v. Muscoda Local, 5 Cir., 137 F.2d 176, 182, 183; Id., 321 U.S. 590, 593, 604,

64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014; Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515. The submission of this issue in the form adopted was in pursuance of the principle underlying special verdicts that the questions to the jury should relate to the ultimate facts rather than to the evidence on which such ultimate facts rest. (53 Am.Juris, Trial, Sec. 1072). But even if, in spite of the special verdict, changing into and out of uniform should be held to be work under the Fair Labor Standards Act, the employer would be relieved of liability to pay for it by the Portal-to-Portal Act. There is no evidence that it was an activity which was ever compensable either by contract or by custom. The plaintiff contends that the Union contract makes it compensable, but the provisions relied upon are merely general overtime provisions and in no way attempt to define the nature of the work for which overtime will be paid. The Act does not merely require that the contract provide for payment of overtime pay but that it must expressly provide that the activities in question be compensable.

■ I hold that the retroactive provisions of the Portal-to-Portal Act apply to the facts of the present case and that the Act as so applied is constitutional.

As to (3), assuming that these activities constitute work under the decision of the Supreme Court in the Mt. Clemens case, they also are noncompensable by the Portal-to-Portal Act.

The foregoing entirely disposes of so much of the plaintiff's claim as is based upon the activities of guards who did not relieve other guards but merely made their rounds through the plant. Although they were customarily on the premises more than 8 hours a day, none of them did compensable work for more than 8 hours. Their rounds of duty began at the beginning of the 8 hour shift and in no case continued beyond its termination. For that they have been paid.

This leaves for consideration the guards who relieved other guards. As to each of these the simple question is: Did he work more than 8 hours?

Continuing, for convenience, with the example of a guard on the B shift: from 3:45 when he arrived on the post until 11:45 when he left it he was "working" within any definition of the term and his activity was one which was compensable by express contract as well as by custom and practice. This activity covered 8 hours and he was paid for 8 hours. His activities from the time when he arrived at the plant until he arrived at his post (say from 3:30 to 3:45) were the same as the preliminary activities of the guards who made rounds and were either not work or, if work, cannot be claimed as overtime under the Portal-to-Portal Act, for the same reasons.

Did he work from 11:45 to 12:00? The jury found as a fact that he did not. In response to the question, "After a guard was relieved, did he continue to work until he punched out?", they answered "No". There was testimony to support this finding. The plant superintendent testified that after such a guard had been relieved at 11:45 he was off duty, through with his job for the day, free to go to the washroom and do as he pleased and was no longer guarding the plant.[1]

Of course, if there were nothing more to this part of the case, this finding of the jury would dispose of the claims of these

---

[1] This finding by the jury is not inconsistent with their answering "Yes" to the third question, which was, "After a guard finished his rounds, did he continue to work until he punched out?" As to the guards on rounds, there was testimony to the effect that such guards were expected to keep watch for intruders and to report violation of rules and disorder of various kinds after their tour of duty had ended. Apart from this, the jury may well have looked at the whole situation realistically and concluded that the guard who had a fixed post was hired to stand guard duty there and to do nothing . else, whereas the guard who made rounds through the buildings was hired to put in a good deal of time in addition to the actual rounds (which took much less than 8 hours) in waiting, sitting around and generally observing conditions for the purpose of maintaining order.

guards. However, the validity of the finding must be examined in the light of the undisputed evidence that our typical guard on the B shift was required to remain on the premises until 12 o'clock and that if he punched out before that time he would be docked.

At this point the provisions of the Fair Labor Standards Act and the Portal-to-Portal Act run parallel and very nearly coincide. Under the first, although custom and practice cannot make what is work, not work, in case of doubtful or ambiguous activity custom and practice may be evidence—perhaps conclusive evidence—that the employer considered the activity work and was willing to pay for it as such. See Skidmore v. Swift & Co., supra. Justice Murphy in the Tennessee Coal case, supra, referred (though without deciding anything) to "the effect that custom and contract may have in boarderline cases where the other facts give rise to serious doubts as to whether certain activity or non-activity constitutes work or employment." Under the second of the statutes, of course, the custom or practice is a determining factor, and thus the fact that the activity was one which was customarily paid for by the employer may have the dual effect both of making it "work" under the Fair Labor Standards Act and making it compensable under the Portal-to-Portal Act.

All this brings us squarely face to face with the perplexing question: What was the practice, custom, understanding and intention of the parties with regard to this last 15 minutes of time? The difficulty arises from the fact that the ostensible work period for which the employer says he intended to compensate the employee does not correspond exactly with the actual period during which the employee worked. If the defendant's position is correct it was not paying these guards for 15 minutes of actual work at the beginning but was making up for it by paying for 15 minutes of nonwork at the end.

The defendant obviously had to have some sort of shift system so that there would be an orderly procedure of changing guards. It could not hire a group of men and let each take his 8 hours work and report in and out when and as he chose. However, what happened was that the employer recognized the fact that the guards wished to advance each shift a matter of 15 minutes and permitted them to do so, paying them for 8 hours which was the full time they stood guard. The requirement that the men should not punch out before 12 o'clock kept the shifts from becoming staggered beyond reason and at the same time did not compel them to remain very long beyond the amount of time necessary to go to the locker room, change out of uniform and into civilian clothes and wash.

In the Tennessee Coal Co. case, supra [321 U.S. 604, 64 S.Ct. 705], the Court said that the fact that a custom or contract cannot be utilized to deprive employees of their statutory rights "does not foreclose, of course, reasonable provisions of contract or custom governing the computation of work hours where precisely accurate computation is difficult or impossible." See also Jewell Ridge Coal Corp. v. Local No. 6167, 325 U.S. 161, 170, 65 S.Ct. 1063, 89 L.Ed. 1534.

In the present case the jury was asked "Was accurate computation of the work hours for the guard force difficult or impossible?", and answered "Yes". This was another fact finding and was based upon ample evidence. While the time clock indicated accurately the precise time when any guard left the plant, there was no practicable method of determining, under the early relief system which had grown up, when any guard began or ceased to work. The jury found in answer to the first question submitted that where guards relieved other guards before the beginning of the shift such relief was not required by the employer, and the fact is that while in a general way the relief was made 15 minutes before the shift began, the employer exercised no control over it and it might sometimes vary 5 or 10 minutes either way. Obviously, there was a reasonable basis for the testimony of the plant superintendent that, so long as the voluntary relief practice existed, no practicable system could be adopted which would accurately reflect the exact time of the guards on post.

The system of computation under which the employer paid these guards was 8 hours

pay for 8 hours work on the post at guard duty. The jury was asked, "Were the guards paid in accordance with a reasonable provision of contract or custom governing the computation of work hours?", and answered "Yes". In view of uncertainties which had been introduced by the departure from the strict shift system and which the jury found to be voluntary on the part of the guards, it cannot be said that the finding of the jury that the custom governing the computation of work hours was reasonable, was unsupported by evidence. The method of computation was based on the employer's assumption that a man received as early a relief as he gave, and the guards testified that this was usually the fact. The guards themselves, obviously, would be more than likely to make their practice correspond to this assumption, but the employer did not make the assumption an ironclad one and, evidently realizing that if a man received a late relief and had himself given an early relief he would have worked more than 8 hours, gave him the benefit of the doubt and paid overtime when he punched out late.

Plaintiff's motions for judgment non obstante veredicto and for new trial are denied.

Defendant's motion for judgment is granted.