Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

BROWN EQUIPMENT AND SERVICE TOOLS, INC., Defendant-Appellee.

No. 80–1708.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1982.

150

Donald S. Shire, Paula W. Coleman, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellant.

Charles R. Vickery, Jr., Houston, Tex., for defendant-appellee.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

RUBIN, Circuit Judge:

The Fair Labor Standards Act requires the payment of time and one-half an employee's regular rate of pay for each hour worked in excess of forty in any workweek. As an exception to this general rule, the Act permits an employer to establish a pay plan, eponymously called a "Belo plan" after the employer whose such plan was first approved by the Supreme Court, guaranteeing a set weekly wage for all hours worked in a week up to sixty. The Secretary contends that the alleged Belo plan used by Brown Equipment and Service Tools, Inc. ("BEST") did not comply with the statutory requirements, as administratively interpreted, for such plans, and that, therefore, its employees were not paid the amounts due them. He seeks both an injunction requiring BEST to pay its employees the sums due them and an injunction restraining BEST from committing any future violations of the Act. Having meanwhile abandoned the challenged plan, BEST contends that it did not violate the statute but that, even if it did, no injunction is warranted. Vaulting the dispute concerning whether BEST's Belo plan was valid, the district court held that, because BEST was in good faith when it adopted the plan and is now unquestionably complying with the Act, any injunction would be punitive and unfair to BEST. Examining the record, we conclude that BEST's plan was not a valid Belo plan, the statute requires that an injunction be issued to assure that the backwages consequently due BEST's employees are paid, but, BEST having complied with the stat-

---

* District Judge of the Western District of Texas, sitting by designation.

ute in every other respect, denial of a general injunction against violation of the Act in the future was warranted.

I. The Validity of BEST's Belo Plan.

BEST provides remedial and emergency services for oil and gas wells, both on land and off shore. It employs servicemen who, at the call of BEST's customers, go to the customers' drilling sites to perform the services required. When not thus engaged, the employees work in BEST's shop, where they maintain equipment, train helpers, and provide support for workers in the field.

In August 1973, BEST adopted a guaranteed pay plan for its field service employees. The plan provided each employee a guarantee of pay for sixty hours of work each week, the first forty to be paid at a specified hourly rate, and the next twenty at time-and-a-half that rate. The employee's actual pay was greater than the guarantee, however, whenever one or both of two conditions occurred: (1) the employee actually worked in excess of sixty hours in a week; or (2) the employee earned production bonuses in that week. If the employee earned such bonuses, the hourly rate was "adjusted;" this, in turn, "adjusted" the overtime rate.[1]

■ The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1976 & Supp. III 1979) (references hereafter are to the 1976 ed.

unless otherwise noted), fixes not only minimum wages but also maximum hours, forty in a workweek, unless the employee receives compensation for the hours in excess of forty at a rate not less than one and one-half times the "regular rate at which he is employed," 29 U.S.C. § 207(a)(1). The purposes of the overtime requirement are two-fold: (1) to spread employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours; and (2) to compensate employees who do work "overtime" for the burden of having to do so. *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 40, 65 S.Ct. 11, 13, 89 L.Ed. 29, 33 (1944). *See also Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 423–24, 65 S.Ct. 1242, 1244, 89 L.Ed. 1705, 1709–10 (1945); *Jewell Ridge Coal Corp. v. Local 6167, UMW,* 325 U.S. 161, 167, 65 S.Ct. 1063, 1067, 89 L.Ed. 1534, 1539 (1945); *Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 578, 62 S.Ct. 1216, 1220, 86 L.Ed. 1682, 1688 (1942). Therefore, the Act forbids pay plans that have the effect of reducing the pay for overtime to less than one and one-half times the employee's "regular rate," even though the plans may be acceptable to the employees involved.

■ The Supreme Court early recognized, however, that jobs requiring irregu-

---

1. In detail, the BEST plan worked as follows:

   (1) The "number of hours worked," $T$, was determined. If the actual number of hours worked was less than or equal to 60, $T$ was set equal to 60; if the actual number of hours worked was greater than 60, $T$ was set equal to the actual number of hours worked.

   (2) The employee's "basic hourly rate," $W$, as specified in his contract, was multiplied by the "number of hours worked," $T$, to give the "weekly base."

   (3) The sum of the production bonuses earned, $B$, was added to the "weekly base" to give the "adjusted weekly base."

   (4) The "adjusted weekly base" was divided by the "number of hours worked," $T$, to give the "adjusted hourly rate."

   (5) Finally, the employee's actual weekly pay, $P$, was determined by adding the product of 40 times the "adjusted hourly rate" (the regular pay component of $P$) to the product of ($T$ minus 40) times one and one-half

times the "adjusted hourly rate" (the overtime component of $P$).

Algebraically:

$$P = (40)\left(\frac{W\,T + B}{T}\right) + (T-40)\left(\frac{3}{2}\right)\left(\frac{W\,T + B}{T}\right).$$

It can readily be seen that both the "adjusted hourly rate," $\frac{W\,T + B}{T}$, and the adjusted overtime rate, $\left(\frac{3}{2}\right)\left(\frac{W\,T + B}{T}\right)$, (and thus $P$) were functionally dependent on the sum of bonuses, $B$, earned each week by the employee. Therefore, the "guarantee," which equaled

$$(40)\left(\frac{W\,(60)}{(60)}\right) + (20)\left(\frac{3}{2}\right)\left(\frac{W\,(60)}{(60)}\right), \text{ or, } 70W,$$

operated to control $P$ only in those weeks in which the employee actually worked less than 60 hours *and* earned no production bonuses. According to the record, bonuses were earned by employees in over 70% of their workweeks.

lar workweeks present unusual problems both for workers and employers and found implicit exception in the original statute for pay plans guaranteeing a regular weekly rate for those workers whose hours inescapably fluctuate from week to week. *Walling v. A. H. Belo Corp.*, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716 (1942). *See also Walling v. Halliburton Oil Well Cementing Co.*, 331 U.S. 17, 67 S.Ct. 1056, 91 L.Ed. 1312 (1947). The principles of these cases were incorporated into the statute in 1949, when Congress enacted a narrow exception to the overtime requirement for a carefully defined category of guaranteed wage plans.[2] Under section 7(f), 29 U.S.C. § 207(f),[3] these plans qualify as an exception to the usual overtime pay requirements only if they meet each of the conditions specified in the statute. First, the duties of the employee must "necessitate irregular hours of work." 29 U.S.C. § 207(f). Second, the employee must be employed pursuant to a bona fide individual contract or collective bargaining agreement. *Id.* Third, that contract must "specif[y] a regular rate of pay" for hours up to forty and one and one-half times that rate for hours over forty. *Id.* at § 207(f)(1). Finally, the contract must provide a weekly pay guarantee for not more than sixty hours, based on the specified rates. *Id.* at § 207(f)(2).

Such plans secure employees whose work necessitates wide and unpredictable fluctuations in hours against "short" paychecks in weeks when they work very few hours. A fixed wage gives such employees "the security of a regular weekly income" so that they can operate on a stable budget. *Walling v. A. H. Belo Corp., supra*, 316 U.S. at 635, 62 S.Ct. at 1229, 86 L.Ed. at 1723.[4] The employer also benefits, for it can both more accurately forecast its labor costs and also work its employees a modest amount of overtime without increasing those costs. *See Marshall v. Hamburg Shirt Corp.*, 577 F.2d 444, 446 (8th Cir. 1978).

Exemptions from or exceptions to the Act's requirements are to be narrowly construed against the employer asserting them. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393, 396 (1960); *Wirtz v. Jernigan*, 405 F.2d 155, 158 (5th Cir. 1968). *See also Usery v. Godwin Hardware, Inc.*, 426 F.Supp. 1243, 1263 (W.D.Mich.1976). That precept applies to Belo plans, which qualify the Act's overtime provisions. Furthermore, an employer who invokes the Belo exception has the burden of showing affirmatively that each of the essential conditions to the exception are met. *Foremost Dairies, Inc. v. Wirtz*, 381 F.2d 653, 656 n.4 (5th Cir. 1967), *cert. denied*, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968). BEST's guaranteed wage plan was not a qualified Belo plan because it failed to meet at least two of the statutory conditions: (1) the employees' duties did not necessitate "irregular hours

---

**2.** *See* Act of Oct. 26, 1949, c. 736, § 7, 63 Stat. 910, 912 (1949). This Act repealed, *id.* at § 16(f), 63 Stat. at 920, the slightly earlier first set of statutory Belo provisions. *See* Act of July 20, 1949, c. 352, § 1, 63 Stat. 446 (1949).

**3.** No employer shall be deemed to have violated subsection [7](a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under subsection (a) if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 6 (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified.

Until 1966, this section was designated as section 7(e). *See* Act of Sept. 23, 1966, Pub.L.No. 89–601, Title II, § 204(d)(1), 80 Stat. 830, 836 (1966).

**4.** Representative Lucas, the chief sponsor of the statutory Belo amendment, explained that it would permit "an employer [to] pay his employees who work different hours each week a fixed guaranteed weekly salary, thus *assuring employees stability of income and employment.* The contracts may be used only if the duties of the employees necessitate irregular hours of work." 95 Cong.Rec. A5475 (1949) (emphasis added).

of work" within the meaning of the statute and (2) the rate of pay specified in the contract did not qualify as a regular rate.

## A. Irregular Hours of Work

As used in the statute, the term, "irregular hours of work," does not mean merely a fluctuating long workweek, consisting only or mostly of variations in the hours required over forty. For hours to be considered irregular within the meaning of section 7(f), they must, in a significant number of weeks, fluctuate both below forty hours per week as well as above, and the fluctuations below forty must result from work requirements, not vacations, holidays, illness or reasons personal to the employee.[5] This follows from one of the basic purposes of the exception, to protect employees against "short" paychecks when the nature of their work requires weeks of substantially fewer than forty hours.

It is undisputed that the field work performed by BEST's employees involved irregular hours, but virtually all were in the overtime range. When not working in the field, the employees, pursuant to BEST's policy of a minimum 40-hour workweek, regularly worked full workweeks in the shop maintaining equipment, training new employees, and providing support services to workers in the field. As a result, all but 12.8% of the weeks worked were overtime weeks—and approximately half of the short workweeks were explained on the employer's payroll records as attributable to typical personal leaves (e.g., vacations or illnesses) or first or last week of work. In the remaining 6.9% of the short workweeks, "day off" was listed in the employer's records (2%) or no reason was given at all (4.9%).[6]

BEST's guaranteed pay plan was deficient because its employees worked less than forty hours in only a small number of weeks, excluding short weeks due to first or last week of work, holidays, vacations, illnesses and other personal reasons. Therefore, BEST failed to show the kind of irregularity in nonovertime hours necessary for the valid use of a Belo plan. The cause of even the slight irregularity in nonovertime hours was not lack of work. Employees testified that they "never" or "rarely" missed a day of work due to a shortage or unavailability of work. While BEST's practice of giving "rest leave" may have been an enlightened employment practice, it was not the type of "irregularity" contemplated by the statute.

## B. Regular Rate of Pay.

Section 7(f) also requires that the employee's contract "specif[y] a regular rate of pay" and that the weekly guarantee be "based on the rates so specified." 29 U.S.C. § 207(f). Section 7(e), in turn, states that the "regular rate" at which an employee is employed includes "all remuneration . . . paid to . . . the employee" except certain types of payments specifically excluded by that subsection, none of which is involved here. 29 U.S.C. § 207(e). Although nowhere expressly stated in the statute, we think it a matter of fair implication that the "regular rate of pay" required to be specified by section 7(f) must be the actual "regular rate" at which an employee is employed as determined under section 7(e).

As noted previously, see text and note at note 1 supra, the BEST pay plan provided for the payment of bonuses to employees in addition to the hourly rates specified in

---

5. *Foremost Dairies, supra,* 381 F.2d at 657–661. *See also Hodgson v. Price,* 486 F.2d 1406 (7th Cir. 1973) (mem.) (otherwise unpublished opinion reported at 21 WH Cases 342, 343), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1969, 40 L.Ed.2d 306 (1974); *Harp v. Continental/Moss-Gordin Gin Co.,* 259 F.Supp. 198, 200 (M.D.Ala.1966), *aff'd per curiam,* 386 F.2d 995 (5th Cir. 1967); Interpretative Bulletin, 29 C.F.R. § 778.406 (1980) (found in *Foremost Dairies, supra,* to be

a "valid and reasonable interpretation of . . . Section 7[(f)]").

6. Sometimes after a worker had come in from working especially long hours in the field, BEST would at its discretion grant the employee leave. The reason BEST granted these leaves was not unavailability of work, but because BEST considered it a "good employment policy" to allow its workers to take time off to rest.

their contracts. These bonuses, earned in over 70% of the workweeks examined, accrued whenever the employee's services were charged directly to a customer, *i.e.,* whenever the employee was working in the field. The total weekly bonus earned by an employee thus depended on the number of hours worked in the field, and further turned upon the type of work performed (*e.g.,* driving a truck, working over water, etc.). Obviously, then, the amount of bonus varied from week to week, resulting in the payment, not only in effect but by the express terms of the contracts as well, of an ever-changing "regular rate" of pay.[7]

[11] A Belo contract must be based upon a specified, non-varying "regular rate of pay." *See Marshall v. Hamburg Shirt Corp., supra,* 577 F.2d at 447.[8] Therefore, because BEST's contracts did not "specif[y] a regular rate of pay," they were invalid under section 7(f).

## II. The Denial of a Restitutionary Injunction.

■ Framed to comport with the traditional role of an injunction, section 17 of the Act, 29 U.S.C. § 217,[9] authorizes the Secretary to sue to enjoin an employer from withholding the payment of minimum wages or overtime compensation found by the court to be due to employees. It thus provides in effect for an injunction requiring an employer to pay back wages. We recounted the history of this peculiar provision in *Wirtz v. Jones,* 340 F.2d 901, 903–04 (5th Cir. 1965). *See also Wirtz v. Robert E. Bob Adair, Inc.,* 224 F.Supp. 750, 753–55 (W.D.Ark.1963); *Wirtz v. Alapaha Yellow Pine Products, Inc.,* 217 F.Supp. 465, 467–68 (M.D.Ga.1963).

As originally enacted in 1938, section 17 granted the district courts jurisdiction to restrain violations of the statutory wage requirements. This was construed judicially as a grant of equitable jurisdiction, conferring power to afford full relief, including restitution or reparation if appropriate. *McComb v. Frank Scerbo & Sons,* 177 F.2d 137, 138–39 (2d Cir. 1949) (reimbursement of unpaid overtime wages); *Walling v. O'Grady,* 146 F.2d 422, 423 (2d Cir. 1944) (reparations for wages lost due to wrongful discharge under section 15(a)(3) of the Act).

Congress reacted to the *Scerbo* decision and others like it by expressly removing from the courts the power to order by in-

---

7. Using the algebraic nomenclature developed in note 1, *supra,* if it be said that the "regular rate of pay" specified in BEST's contracts was $W$, then clearly BEST's plan was invalid since the actual "regular rate" at which its employees were

employed was $\dfrac{W \cdot T + B}{T}$. If, on the other hand, it is argued that the "regular rate of pay" specified in BEST's contracts was not $\underline{W}$ but was $\dfrac{\underline{W} \cdot T + B}{T}$, then BEST's plan was invalid both because the guarantee was based upon $\underline{W}$, *see* note 1 *supra,* and the rate of pay fluctuated from week to week. A rate that changes in 70% of the workweeks cannot be considered "*a regular* rate of pay." 29 U.S.C. § 207(f) (emphasis added).

then BEST's plan was invalid both because the guarantee was based upon $W$, *see* note 1 *supra,* and the rate of pay fluctuated from week to week. A rate that changes in 70% of the workweeks cannot be considered "*a regular* rate of pay." 29 U.S.C. § 207(f) (emphasis added).

8. *See* Interpretative Bulletin, 29 C.F.R. § 778.-408(c) (1980), *as amended by* 45 Fed.Reg. 7308, 7317 (1981), stating "[I]t is not possible to enter into a guaranteed pay agreement of the type permitted under section 7(f) with an employee whose regular weekly earnings are made up in part by the payment of regular bonuses...." Extra compensation paid over and above the guaranteed wage which is not regularly paid as part of the employee's wages, such as holiday premiums, year-end bonuses, or excessive work premiums, will not invalidate an otherwise proper Belo contract, since section 7(e) excludes such payments from the regular rate. *See* Interpretative Bulletin, 29 C.F.R. 778.408(d) (1980).

9. The district courts ... shall have jurisdiction, for cause shown, to restrain violations of section 15 [, 29 U.S.C. § 215], *including* in the case of violations of section 15(a)(2) [, 29 U.S.C. § 15(a)(2) (making it unlawful to violate the minimum wage and overtime provisions of the Act),] *the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this Act ....* 29 U.S.C. § 217 (emphasis added).

junction the payment of past due minimum wages or overtime. *See* Act of Oct. 26, 1949, c. 736, § 15, 63 Stat. 910, 919–20 (1949). At the same time, however, it conferred new authority on the Secretary to bring suits on behalf of employees (when requested by them to do so) for such amounts, provided that the litigation did not involve "an issue of law ... not ... settled finally by the courts...." *Id.* at § 14, 63 Stat. at 919 (current version at section 16(c) of the Act, 29 U.S.C. § 216(c) (Supp. III 1979)).[10] Thus, after the 1949 amendments to the Act, employees could bring suit on their own behalf to recover unpaid wages (and an additional equal amount as liquidated damages) under section 16(b) of the Act, *current version at* 29 U.S.C. § 216(b) (Supp. III 1979), or, alternatively, the Secretary could bring suit on behalf of employees, subject to the limitations just described, under section 16(c).[11]

By 1961, Congress had become dissatisfied with this system, finding that "[v]ery few of these suits have been brought by employees under section 16(b) of the act and of the few that have been brought most are initiated by individuals no longer in the employ of the defendant employer." Report of the Senate Committee on Labor and Public Welfare, S.Rep.No. 145, 87th Cong., 1st Sess., *reprinted in* [1961] U.S.Code Cong. & Ad.News 1620, 1658. Congress, therefore, enacted the current version of section 17, *see* Act of May 5, 1961, Pub.L.No. 87–30, § 12(b), 75 Stat. 65, 74–75 (1961), reconferring on the Secretary the authority to seek by injunction the payment of back wages due. Courts are still not, however, authorized to require payment of liquidated damages in section 17 suits.[12] *See* S.Rep.No. 145, *supra,* [1961] U.S.Code Cong. & Ad.News at 1659.

The district court denied the Secretary's request for a restitutionary injunction against BEST under section 17 because BEST's management initiated the Belo plan in good faith and because it is now complying with the law. The court also relied on what it perceived to be the lack of any financial gain accruing to BEST as the result of its use of the invalid plan. None of these is adequate reason to deny employees the back pay due them.

A restitutionary injunction under section 17 is intended to accomplish several purposes. First, and most obviously, it is intended to compensate the affected employees for the losses they sustained as a result of the wrongful withholding of their wages. *Hodgson v. American Can Co.*, 440 F.2d 916, 922 (8th Cir. 1971). Such "losses" are the ineluctable result of a finding that an employer's attempted Belo plan is invalid because, in such cases, "all the compensation received by the employee under [the] plan is included in his regular rate and no part of such guaranteed pay may be credited toward overtime compensation due under the Act." Interpretative Bulletin, 29 C.F.R. § 778.403 (1980). Moreover, the issuance of the injunction against withholding back pay is indispensable to its restitution in these cases, for once the Secretary has sought such an injunction, the employees' right to sue for wages due is terminated. Section 16(b), 29 U.S.C. 216(b) (Supp. III 1979). Therefore, if the court refuses to order the payment of back wages in the Secretary's suit, the employees "will have a legal right to that money without any means to enforce it." *Wirtz v. Malthor, Inc.*, 391 F.2d 1, 3 (9th Cir. 1968).

The second major purpose is "to correct a continuing offense against the public interest." *See, e.g., Marshall v.*

---

**10.** Section 16(c) has since been amended to allow the Secretary to bring suit irrespective of the receipt of a written request from an employee and also without regard to whether the suit involves an unsettled issue of law. *See* Act of Apr. 8, 1974, Pub.L.No. 93–259, § 26, 88 Stat. 55, 73 (1974).

**11.** Furthermore, until 1974, the Secretary was prohibited from recovering in a suit brought under § 16(c) the additional amount equal to the unpaid wages as liquidated damages. *See* Act of Apr. 8, 1974, *supra* note 10.

**12.** *Compare* 29 U.S.C. § 217 *with* 29 U.S.C. § 216(c) (Supp. III 1979) (discussed in text and note at note 11 *supra*).

*A&M Consolidated Independent School District*, 605 F.2d 186, 189 (5th Cir. 1979), *quoting Wirtz v. Jones, supra*, 340 F.2d at 904.[13] Therefore, a district court, in deciding whether to grant a restitutionary injunction, may not focus only on the interests of the parties to the suit before it. Requiring the payment of back wages is meant both to "increase the effectiveness of the enforcement of the Act by depriving a violator of any gains accruing to him through his violation," *Marshall v. A&M Consolidated Independent School District, supra*, 605 F.2d at 189, *quoting Wirtz v. Malthor, Inc., supra*, 391 F.2d at 3, and to protect those employers who comply with the Act's wage requirements from having to compete unfavorably with those who fail to comply. *Wirtz v. Jones, supra*, 340 F.2d at 905 (citing S.Rep.No. 145, *supra*, [1961] U.S.Code Cong. & Ad.News at 1621).

▮ This is not to suggest that section 17 restitutionary injunctions should issue as a matter of course upon a finding of past wages due. *Compare Wirtz v. Malthor, Inc., supra*, 391 F.2d at 3 (granting restitutionary injunction) *with Brennan v. Saghatelian*, 514 F.2d 619, 621–622 (9th Cir. 1975) (denying such an injunction). If, for example, the employer is bankrupt, an injunction would be vain and the employer should not be threatened with citation for contempt for not doing what he is unable to do.

▮ On the other hand, the trial judge's discretion should be exercised with an eye to the purposes of the Act. *See, e.g., Mitchell v. Ballenger Paving Co.*, 299 F.2d 297, 300–01 (5th Cir.), *cert. denied*, 370 U.S. 922, 82 S.Ct. 1565, 8 L.Ed.2d 503 (1962).[14] A section 17 injunction provides a remedy for violation of national labor policy in a single suit initiated by the Secretary on his own volition, thus avoiding potential multiplicity of employee actions on the one hand and, on the other, the complete abandonment of their just wages by employees apprehensive of employer retaliation. When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose. *See Shultz v. Parke, supra*, 413 F.2d at 1368–70 (5th Cir. 1969); *Wirtz v. B. B. Saxon Co.*, 365 F.2d 457, 462–63 (5th Cir. 1966). *Cf. United States v. Hayes International Corp.*, 415 F.2d 1038, 1044–45 (5th Cir. 1969) (Title VII).

Viewed against these precepts, the district court's denial of a restitutionary injunction was an abuse of its small residue of discretion. BEST's good faith is immaterial, for requiring the employer to pay what is justly due its employees is not punishment. The delinquent employer must remit only what it improperly failed originally to pay. Present compliance is also no excuse, for a restitutionary injunction is not designed to assure future compliance but merely to correct past dereliction. The court also accepted BEST's specious argu-

---

13. *Accord, Shultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1272–73 (10th Cir. 1970); *Shultz v. Parke*, 413 F.2d 1364, 1370 (5th Cir. 1969); *Shultz v. Mack Farland & Sons Roofing Co.*, 413 F.2d 1296, 1302 (5th Cir. 1969); *Wirtz v. Malthor, Inc., supra*, 391 F.2d at 3.

14. *Cf. Mitchell v. Robert de Mario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). In that case, the district court found that an employer had wrongfully discharged certain of its employees in violation of § 15(a)(3) of the Act; it declined in the exercise of its discretion, however, to order the payment of lost wages under § 17. The court of appeals affirmed, but assigned as its reason its belief that the 1949 amendment to § 17, *see* Act of Oct. 26, 1949, *supra*, at § 15, had deprived the district courts of jurisdiction to order by in-junction *any* types of back wages. In a holding not here relevant, the Supreme Court reversed the court of appeals, finding that the 1949 amendment had done no more than deprive the district courts of jurisdiction to order back wages in minimum wage and overtime cases (*i.e.*, not wrongful discharge cases). With language quite relevant to our present inquiry, however, the Court remanded the case to the court of appeals to determine whether the district court had abused its discretion in denying back wages: "[B]ecause of what we have found to be the statutory purposes, *there is doubtless little room for the exercise of discretion not to order reimbursement ....*" 361 U.S. at 296, 80 S.Ct. at 337, 4 L.Ed.2d at 329 (emphasis added).

ment that it did not benefit economically by its invalid plan because its payroll for the next year, after it had adopted a proper plan, was less than the amount paid under the non-complying Belo plan. Of course, no mere comparison of gross pay would demonstrate whether or not there was an economic gain to BEST; that could be determined only by comparing hours worked each week, numbers of employees, and weekly wages in each of the years. In the later year, BEST may have employed fewer employees, reduced overtime, or its volume of business may have declined. In any event, the Secretary points out that BEST did benefit subtantially by using as working capital the sum, calculated by the Secretary to be $235,000, that it now owes to its employees as the result of its use of an invalid Belo plan.

In short, the district court erroneously viewed the restitutionary injunction as the equivalent of a prospective injunction without taking into account the former's specific purposes. An injunction prohibiting future violation is directed toward quite different goals: assuring compliance with the Act in the future and shifting the responsibility for this future compliance from the Secretary of Labor to the employer.

### III. The Denial of a Prospective Injunction.

The Supreme Court has expressly recognized the discretionary nature of a section 17 prospective injunction restraining future violations of the Act. *See Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 215, 79 S.Ct. 260, 266, 3 L.Ed.2d 243, 249 (1959). The district court denied the prospective part of the sought injunction primarily on the ground that BEST had acted in good faith and that the district court did not believe that it would again violate the Act. In *Dunlop v. Davis*, 524 F.2d 1278 (5th Cir. 1975), we concluded, after reviewing our many cases on the subject, that "the two factors properly to be considered in determining whether a per-

manent [prospective] injunction should be granted are the previous conduct of the employer and the dependability of his promises for future compliance." 524 F.2d at 1281. Reviewing the record, we cannot say that the district court's determination that BEST acted in good faith both in adopting its invalid plan and in correcting it when informed of its error was erroneous. The trial court properly took into account the fact that BEST adopted, before trial, a pay plan unquestionably in compliance with the Act. We, therefore, hold that the district court's denial of a prospective injunction was not an abuse of its discretion, broader in this area than in the decision whether to order backpay.

In sum, the BEST Belo plan was invalid. The denial of a restitutionary injunction is REVERSED. The case is REMANDED for further proceedings consistent with Parts I and II of this opinion.[15] The denial of an injunction against future violations of the Act is AFFIRMED.

---

**15.** While the Secretary submitted calculations of the back pay due, the district court made no findings thereon.