No. 98-556

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 255

296 Mont. 319

989 P.2d 317

JAMES A. KEMP, d/b/a

YELLOWSTONE MINE RESTAURANT,

Appellant and Appellant,

v.

STATE OF MONTANA BOARD OF

PERSONNEL APPEALS,

LABOR COMMISSIONER, STATE

OF MONTANA & CYNTHIA SHOWERS,

Respondents and Respondents.

APPEAL FROM: District Court of the Sixth Judicial District,

In and for the County of Park,

The Honorable William Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Michael B. Anderson, Anderson & Liechty., Billings, Montana

For Respondent:

Charles K. Hail, Department of Labor, Helena, Montana

Submitted on Briefs: August 19, 1999

Decided: October 21, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶ James A. Kemp, doing business as Yellowstone Mine Restaurant (collectively "Kemp"), appeals from the Judgment entered by the Sixth Judicial District Court, Park County, that affirmed the Board of Personnel Appeals' (the Board) determination that Kemp owed Cynthia Showers (Showers) $5,204.83 for unpaid wages. We reverse.

¶ Kemp raises two substantive issues on appeal, which we restate as follows:

¶ 1. Did the District Court err in determining that Showers was not an exempt employee under the Fair Labor Standards Act?

¶ 2. Did the District Court err in considering evidence of hours that Showers worked before the period of her claim to help determine how many hours she worked during the period of her claim?

¶ Because we hold that the District Court erred as a matter of law in ruling that Showers was not an exempt employee, Issue 1 is dispositive, and it is unnecessary that we address Issue 2.

### Factual and Procedural Background

¶ Showers began working at the Yellowstone Mine Restaurant in Gardiner, Montana in 1989. Initially, Showers was a line cook and was paid an hourly wage. On June 16, 1990, Kemp promoted Showers to assistant chef and paid her a salary of $1000 per month. On July 16, 1991, Kemp promoted Showers to head chef and paid her a salary of $1400 per month. On December 16, 1992, Kemp took Showers off salary and again paid her an hourly wage. Showers voluntarily quit her employment on May 15, 1993.

¶ On January 28, 1994, Showers filed a claim with the Montana Department of Labor and Industry which alleged that Kemp owed her unpaid wages. Showers' claim alleged that Kemp failed to pay her wages from December 31, 1989, through

May 15, 1993.

¶ Kemp was notified of Showers' claim on January 31, 1994. Since the Fair Labor Standard Act's statute of limitations is two years from the date of employer notification, the Board concluded that Showers may only claim unpaid wages from January 31, 1992, through May 15, 1993.

¶ In July 1995, a Montana Department of Labor and Industry hearings examiner held a hearing on Showers' claim for unpaid wages. The hearings examiner issued his Findings of Fact, Conclusions of Law, and Order on September 27, 1995. The hearings officer determined that Kemp owed Showers $5,820.15 for unpaid wages. Kemp appealed to the Board. On January 26, 1996, the Board remanded the case to the hearings officer. On March 6, 1996, the hearings officer issued amendments to his earlier findings and conclusions. Kemp again appealed the hearings officer's decision to the Board. On May 31, 1996, the Board issued its Final Order which affirmed the hearings officer's amended findings and conclusions.

¶ On July 2, 1996, Kemp petitioned the District Court for judicial review. The District Court affirmed the Board's decision. Kemp appeals.

## Standard of Review

¶ This Court reviews an administrative agency's conclusions of law to determine whether the conclusions are correct. *Lewis v. B & B Pawnbrokers, Inc.*, 1998 MT 302, ¶ 18, 292 Mont. 82, ¶ 18, 968 P.2d 1145, ¶ 18 (quoting *Langager v. Crazy Creek Products, Inc.*, 1998 MT 44, ¶ 13, 287 Mont. 445, ¶ 13, 954 P.2d 1169, ¶ 13). We review an administrative agency's findings of fact to determine whether the findings are clearly erroneous. *Lewis*, ¶ 18.

## Issue 1.

¶ *Did the District Court err in determining that Showers was not an exempt employee under the Fair Labor Standards Act?*

¶ Kemp maintains that Showers was employed in an executive capacity under 29 U.S.

C. § 213(a)(1), and, therefore, that she was exempt from the Fair Labor Standards Act's (FLSA) overtime wage requirements. The Board, however, contends that Showers spent most of her time preparing food. Consequently, the Board maintains that Showers was not an exempt employee.

¶ The FLSA, codified at 29 U.S.C. §§ 201 through 219, establishes minimum wage, overtime, child labor, and equal pay requirements. 29 C.F.R. § 778.0 (1998). The United States Department of Labor (DOL) promulgates the operative definitions of the terms used in the FLSA. *Public Employee's Ass'n v. Dept. of Transp.*, 1998 MT 17, ¶ 10, 287 Mont. 229, ¶ 10, 954 P.2d 21, ¶ 10 (citing *Spradling v. City of Tulsa, Okl.* (10th Cir. 1996), 95 F.3d 1492, 1495). The DOL's regulations are entitled to deference and are the primary source of guidance for determining the scope and extent of the exemptions to the FLSA. *Public Employee's Ass'n*, ¶ 10 (citing *Spradling*, 95 F.3d at 1495).

¶ The FLSA requires employers to pay employees at least one and one-half times the employees' regular rate of pay for hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). Notwithstanding, employees who are employed in a "bona fide executive . . . capacity" are exempt from the FLSA's minimum wage and overtime compensation requirements. 29 U.S.C. § 213(a)(1).

¶ Exemptions from the FLSA's requirements are to be narrowly construed against the employer asserting the exemption. *Public Employee's Ass'n*, ¶ 11 (citing *Donovan v. Brown Equipment & Service Tools, Inc.* (5th Cir. 1982), 666 F.2d 148, 153). The employer has the burden of proving that the employee fits "plainly and unmistakably within the exemption's terms." *Public Employee's Ass'n*, ¶ 11 (quoting *Spradling*, 95 F.3d at 1495).

¶ Employees are employed in an executive capacity under 29 U.S.C. § 213(a)(1) if they are paid a salary of $250 or more per week, if they customarily and regularly direct the work of two or more other employees, and if their primary duty is managing the enterprise in which they are employed or managing a customarily recognized department or subdivision of the enterprise. 29 C.F.R. § 541.1(f). *See also* 29 C.F.R. 541.119.

¶ The parties agree that Kemp paid Showers a salary of $250 or more per week during the period at issue and that Showers directed the work of two or more other

employees. They disagree, however, over whether Showers' primary duty was management.

¶ The DOL's regulations provide five factors to weigh in determining whether an employee's primary duty is management: (1) the time spent performing managerial duties; (2) the relative importance of the employee's managerial duties as compared with the employee's other duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid to subordinates for the non-exempt work performed by the employee. 29 C.F.R. § 541.103. We will address these factors in turn.

### Time Spent Performing Managerial Duties

¶ The federal regulations state that the amount of time spent performing managerial duties "is a useful guide in determining whether management is the primary duty of an employee." 29 C.F.R. § 541.103. Primary duty generally means "the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103. "Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty." 29 C.F.R. § 541.103.

¶ In the instant case, Showers testified, and the hearings officer found, that she spent 20 percent of her time performing managerial work and 80 percent of her time cooking. Hence, under the general time rule, Showers' primary duty was not managing the kitchen; rather, her primary duty was cooking. Thus, this factor supports the hearings officer's determination that Showers was not an exempt employee.

¶ The regulations, however, recognize that "[t]ime alone . . . is not the sole test." 29 C.F.R. § 541.103. Hence, employees who spend less than 50 percent of their time managing may have management as their primary duty if the other factors support that conclusion. 29 C.F.R. § 541.103. *See also Dole v. Papa Gino's of America, Inc*. (D. Mass. 1989), 712 F.Supp. 1038, 1043 (citation omitted) (stating the "primary duty" means "principal" or "chief" duty and, thus, that the determination of whether an employee's primary duty is management does not depend entirely on whether the employee spends more than 50 per cent of his or her time managing).

*Relative Importance of the Employee's Managerial Duties as*

***Compared with the Employee's other Duties****¶ The next factor to consider is whether the employee's managerial duties are more important than the employee's other duties. 29 C. F.R. § 541.103. In Donovan v. Burger King Corp. (2nd Cir. 1982), 675 F.2d 516, 521, the Second Circuit Court of Appeals addressed the relative importance of the managerial duties of assistant managers working at Burger King restaurants. The assistant managers testified that the restaurants could not operate successfully unless they performed their managerial duties, which included determining the amount of food to be prepared, running cash checks, scheduling employees, keeping track of inventory, and assigning employees to particular jobs. Donovan, 675 F.2d at 521. Hence, the court ruled that the assistant managers' most important work was managing the restaurants. Donovan, 675 F.2d at 521 (citations omitted).*

*¶ In the case at bar, Showers testified that she, like the assistant managers in Donovan, determined how much food to be prepared; scheduled employees; kept track of inventory; and directed the work of other employees. Moreover, Showers testified that she ordered food and minor kitchen supplies from suppliers; kept inventory records; trained new cooks; oversaw product quality; helped Kemp order major kitchen equipment; set the prices of daily specials; dealt with customers regarding special requests; dealt with regulatory officers, such as health inspectors; and met with customers planning weddings and other special events.*

*¶ Showers' testimony therefore shows that she took care of the duties that needed to be done so that her subordinates could work and so that the kitchen could operate successfully. Thus, we conclude that Showers' managerial duties were more important than her other duties.*

*Frequency with which the Employee Exercises Discretionary Powers*

**¶ The next factor to consider is the frequency with which the employee exercises discretionary powers. 29 C.F.R. § 541.103.**

**¶ Here, Showers testified that she exercised independent judgment regarding the operation of the kitchen and that it was "her kitchen to operate." Showers testified that she was in charge of the other cooks and dishwashers when she was working. Showers also testified that she determined, on a weekly basis, the quantity of food**

and supplies to order. She stated that she decided the quality of food to order and from which company to order food and supplies. Showers also stated that she sometimes suggested to Kemp who to hire and who to fire.

¶ Showers' testimony thus shows that she made decisions concerning the operation of the kitchen on a weekly, if not a daily, basis. We thus conclude that Showers' testimony shows that she frequently exercised discretionary powers.

### *Employee's Relative Freedom from Supervision*

¶ The next factor to consider is the employee's relative freedom from supervision. 29 C.F.R. § 541.103. In *Donovan*, the court ruled that the assistant managers were relatively free from supervision because they were solely in charge of their restaurant for most of their working time. *Donovan*, 675 F.2d at 522.

¶ In the case at bar, Showers summed up her role at the restaurant by stating that she, like the assistant managers in *Donovan*, was "in charge" of the kitchen and that she "was responsible for the other cooks." Showers also stated that she was responsible for food costs and the restaurant's "bottom line." Showers then stated that Kemp did not instruct her on how to operate the kitchen and that she spoke with him "as little as possible." Showers also testified that she set her own work schedule.

¶ Showers' testimony thus shows that she ran the kitchen. The hearings examiner, however, ruled that Showers was not free from supervision because Kemp made decisions regarding hiring and firing and also because Showers was required to get Kemp's permission to purchase major kitchen equipment. Notwithstanding, an employee will have management as his or her primary duty under the federal regulations if they are *relatively*, as distinguished from *completely*, free from supervision. 29 C.F.R. § 541.103. Moreover, we note that few managers are completely free from the supervision of either a more senior manager or the owner of the business in which they work. Thus, we hold that Showers' testimony shows that, while she was not completely free from supervision, she was relatively free from supervision.

### *Relationship between the Employee's Salary and the Wages Paid to*

### *Subordinates for the Non-exempt Work Performed by the Employee*

¶ **The final factor to consider is the relationship between the employee's salary and the wages paid to the employee's subordinates for the non-managerial work performed by the employee. 29 C.F.R. § 541.103.**

¶ **Showers testified that Kemp provided her with health insurance even though the line cooks were generally not offered health insurance. Thus, even though the hearings examiner found the record inconclusive as to the relationship between Showers' salary and the wages paid to her subordinates, Showers' testimony shows that Kemp compensated her better than her subordinates.** *See In re Marriage of Beadle*, **1998 MT 225, ¶ 25, 291 Mont. 1, ¶ 25, 968 P.2d 698, ¶ 25 (including health insurance in the computation of a person's income). Hence, we conclude that the relationship between Showers' salary, including her health insurance, and the wages paid to her subordinates supports the position that Showers' primary duty was management.**

¶ **In sum, although Showers spent 80 per cent of her time performing non-managerial work, the other factors in the federal regulations support the conclusion that Showers' primary duty was management. Hence, even though exemptions from the FLSA's requirements are to be narrowly construed against the employer asserting the exemption and that the employer has the burden of proving that the employee fits plainly and unmistakably within the exemption's terms, we hold, as a matter of law, that Showers was an exempt employee under the FLSA.**

¶ **Reversed.**

/S/ JAMES C. NELSON

We Concur:

/S/ JAMES C. NELSON

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

Justice William E. Hunt, Sr., dissents.

**¶ I dissent, first, because the majority fails to properly defer to the Department as a specialized administrative agency charged with making an initial evidentiary determination in wage and labor disputes. As a corollary to that lack of deference, the majority's creative balancing of the factors found in 29 C.F.R. § 541.103 cannot obscure the fact that the Court effectively engages in an improper re-weighing of the evidence in this case. I dissent, second, because the majority's reliance on the <u>Burger King</u> decision is unpersuasive. That employees of a franchise enterprise have been found to be employed in a managerial capacity in the factual context of a modern, multi-store operation lends little credence to the conclusion that Showers was an executive exempt employee in the entirely different business context of the Yellowstone Mine Restaurant.**

## I. THIS COURT MAY NOT RE-WEIGH THE EVIDENCE

**¶ In 1938, on the heels of the Great Depression, the FLSA was passed by Congress "to prevent the use of unfair trade practices in interstate commerce leading to 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . .' " Stewart v. Region II Child and Family Serv. (1990), 242 Mont. 88, 94, 788 P.2d 913, 917 (quoting 29 U.S.C. § 202(a)). Like the FLSA, which establishes a minimum hourly wage and a maximum workweek under federal law, the Minimum Wage and Maximum Hour Act was enacted by the Montana Legislature in 1971 to ensure a minimum living standard for Montana workers by setting minimum hourly wages and maximum allowable work hours per week under state law. Stewart, 242 Mont. at 94, 788 P.2d at 917.**

**¶ Both the FLSA and the Montana Act constitute similar "expressions of public policy created to protect workers . . . ." Hoehne v. Sherrodd, Inc. (1983), 205 Mont. 365, 369, 668 P.2d 232, 234. Thus, "overtime premiums are for the protection and**

benefit of the general public . . . . " <u>Hoehne</u>, 205 Mont. at 370, 668 P.2d at 234. Since wage protection laws have been enacted for public benefit and protection, " '[w]itholding wages due, such as overtime pay, is considered a continuing public offense.' " Lewis v. B & B Pawnbrokers, 1998 MT 302, ¶ 24, 292 Mont. 82, ¶ 24, 968 P.2d 1145, ¶ 24 (quoting <u>Hoehne</u>, 205 Mont. at 369, 668 P.2d at 234).

¶ In order to implement the public's right to a minimum living standard, the Montana Legislature has charged the Department with the statutory duty to enforce Montana wage laws and protect Montana citizens, and the Department is also authorized to enforce, where applicable, the minimum wage and overtime provisions of the FLSA. <u>See</u> <u>Hoehne</u>, 205 Mont. at 367, 668 P.2d at 233. Here, the Department was called upon to apply and enforce the FLSA, which "protects all citizens." <u>Hoehne</u>, 205 Mont. at 368, 668 P.2d at 233.

¶ The important point is that both Congress and the Montana Legislature have determined that limited judicial review of the operative facts in an administrative determination under the FLSA is more consistent with the underlying public policy of ensuring minimum wages and overtime pay for the vast majority of workers in modern society. Therefore, exemptions from the requirements of the FLSA "are to be narrowly construed against the employer asserting them." Montana Pub. Employee's Ass'n v. Montana Dep't of Transp., 1998 MT 17, ¶ 11, 287 Mont. 229, ¶ 11, 954 P.2d 21, ¶ 11 (citing Donovan v. Brown Equip. & Serv. Tools, Inc. (5th Cir. 1982), 666 F.2d 148, 153). In turn, the employer bears the burden of demonstrating that "the employee fits 'plainly and unmistakably within the exemption's terms.' " <u>Montana Pub. Employee's Ass'n</u>, ¶ 11 (quoting Spradling v. City of Tulsa (10th Cir. 1996), 95 F.3d 1492, 1495; Reich v. State of Wyoming (10th Cir. 1993), 993 F.2d 739, 741).

¶ While this scheme certainly tilts the scales in favor of enforcing minimum wage and overtime laws against employers, such a weighted scheme is entirely consistent with laws that are expressions of public policy designed to benefit and protect the public. For essentially the same reason, this Court's review of the evidentiary determinations underlying a Department decision is legislatively circumscribed: "[J]udicial review of factual matters is limited. The reviewing court will not overturn an agency's findings of fact unless they are clearly erroneous. Facts supported by substantial credible evidence are not clearly erroneous." Wage Claim of Holbeck v. Stevi-West, Inc. (1989), 240 Mont. 121, 124, 783 P.2d 391, 393.

**¶ The Department found as follows regarding the statutory claim period of January 31, 1992, through May 15, 1993:**

[Showers'] work duties as head chef included scheduling two to six other cooks and a dishwasher. She assigned work and evaluated work quality, wrote articles for a news letter but did not decide advertising, trained employees, determined daily specials and the price of daily specials, ordered and inventoried food supplies and other day-to-day management activities.

At one point [Showers] wanted to take an item off the menu and was not allowed to do so. [Kemp], in one case, hired a kitchen staff worker who [Showers] did not want to hire but her opinion was disregarded. If a staff member failed to show up for work she would find a replacement. She could not discharge a staff member without approval of [Kemp]. Other on duty cooks also determined the daily specials and the special price for that meal or special.

The majority of [Showers'] time was spent in food preparation responsibilities. [Showers] could hire cooks with management approval and also recommend their discharge. She did not have independent authority regarding staff and did not regulate pay rates or benefits of staff she supervised. [Showers] did counsel or leave notes for the members of the cocktail and wait staff but not as their direct supervisor because she was only in charge of the cooks and dishwashers. She had no authority over the wait staff. Notes which she left for other staff instruction were not provided as a supervisor of those staff members but [as Showers'] method of trying to help not only the kitchen operation but that of the entire restaurant.

[Showers] did set meal prices for the daily specials but the total menu price and content was determined by [Kemp].

From January, 1992 through June of 1992, [Showers] was supervised by another cook, Phil Currie. During that period, he ordered food, scheduled staff, and supervised all cooks and dishwashers. He determined the specials and the specials' price as well as controlled inventory.

[Showers'] normal work schedule varied with the peak and slow times.

Generally, she worked Tuesday through Saturday through the winter and Monday through Friday during the remainder of the year. In the statutory claim period January 31, 1992 through May 1993, no time records were maintained [by Kemp] for the period January 31, 1992 through December 15, 1992.

¶ The foregoing factual findings were well documented by the Department with specific references to the administrative record. In short, the findings are supported by "reliable, probative, and substantial evidence on the whole record . . . ." Section 2-4-704(2)(v), MCA. Nor are the Department's findings otherwise clearly erroneous. That should be the end of our inquiry, as this Court is statutorily prevented from "substitut[ing] its judgment for that of the agency as to the weight of the evidence on questions of fact." Section 2-4-704(2), MCA. Regardless of whether Showers' testimony suggests that she viewed herself as having worked in a managerial capacity at the Yellowstone Mine Restaurant, the Department made a well-reasoned and factually supported analysis of why, under all the circumstances of employment, Showers was not an executive exempt employee pursuant to the FLSA.

¶ In my view, certain of the Department's findings are particularly noteworthy: (1) that for much of the relevant time-period at issue in this appeal, Showers was in fact under the supervision of another cook; (2) that despite Showers being under such supervision for much of the claim period, Kemp failed to keep any time records of Showers' work during that time; (3) that when Showers did act in a pseudo-managerial capacity during the claim period, she had minimal control over many decisions that would ordinarily be considered attendant to executive status, namely, the power to hire, fire, and discipline those employees that worked under her and to make other significant business decisions; (4) that the exercise of Showers' pseudo-managerial duties were subject to substantial oversight by Kemp and, therefore, were not truly discretionary in nature; and (5) that many of Showers' duties that could be considered managerial in nature were shared with other cooks in the kitchen.

¶ Kemp asserted below, as he asserts on appeal, that Showers was an executive exempt employee because she was primarily engaged in the management of the enterprise or a customarily recognized department or subdivision thereof. That

**Kemp has failed to meet his weighty burden of proving that Showers fits "plainly and unmistakably" within the executive exemption is revealed by comparing the Department's findings of fact with the instructive description of managerial and supervisory functions performed by a bona fide executive employee under the federal regulations:**

> For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his [or her] department or the supervision of the employees under him [or her]: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [workers] and the property.

29 C.F.R. § 541.102(b).

**¶ Viewing the evidence as a whole, I agree with the Department that Kemp was essentially utilizing Showers as a "straw boss" to circumvent the FLSA's overtime requirements. On balance, the findings are supported by substantial credible evidence and, therefore, should be considered conclusive by this Court. The Department's findings demonstrate that Showers' primary duty was simply not managerial. Although the majority focuses upon other facts in the administrative record suggesting that the Department reached an incorrect legal conclusion on executive exempt status, those other facts are essentially irrelevant under our limited standard of review of the evidence supporting an administrative decision. And, indeed, the very manner in which the majority delicately tiptoes through the material facts in applying the factors found in 29 C.F.R. § 541.103 indicates that the FLSA executive exemption has been effectively construed in favor of the employer, Kemp, rather than being narrowly construed against him.**

## II. <u>BURGER KING</u> IS DISTINGUISHABLE

¶ <u>Burger King</u> **is plainly distinguishable. The majority's attempt to analogize the facts of this case to the <u>Burger King</u> decision is unpersuasive. While I do not disagree that employees of a fast food franchise restaurant can have management as their primary duty even though they spend a majority of their time on non-exempt work and exercise little managerial discretion, the same result should not obtain here. Franchise enterprises operate in a largely centralized, top-down manner, with relatively detailed business procedures which must be maintained and enforced by managerial employees of local stores. In that business context, an employee's performance of non-exempt work alongside the performance of exempt duties can still be construed as the "very essence of management," since the managerial employee of a local fast food franchise is quite literally the linchpin in upholding the standardized business practices and commercial methods of a successful chain of identical enterprises. However, in the factual context of the instant case, a unitary restaurant establishment where the owner exercises most of the significant discretionary powers associated with management and substantially oversees the work of the putative "manager," the same rationale should not apply. When put in proper context, Showers simply did not exercise sufficient discretion and independent judgment to have management of the Yellowstone Mine Restaurant as her primary duty.**

¶ <u>Burger King</u>, **like this case, involved a situation where restaurant managers spent over half of their time on the performance of non-exempt work. In analyzing the second factor of 29 C.F.R. § 541.103, relative importance of managerial and non-managerial duties, the Second Circuit Court of Appeals concluded that:**

> [I]t is clear that the [Burger King franchise] restaurants could not operate successfully unless the managerial functions of Assistant Managers . . . . were performed. For that reason, as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial.

<u>Burger King</u>, 675 F.2d at 521.

¶ **However, in concluding that the Burger King managers had management as their**

most important duty, the court cited a number of earlier cases in the industrial context that had found exempt status for employees in charge of a customarily recognized subdivision or department of the business enterprise, notwithstanding that the employees' duties were largely routine, their discretion limited by standardized business procedures, and much of their time spent on non-exempt tasks. See Burger King, 675 F.2d at 521 (citing Walling v. General Indus. Co. (1947), 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 (holding that a working foreman was an exempt employee because oversight of workers engaged in the production processes of a highly mechanized industrial plant was indispensable to the operation of the plant as a whole); Wainscoat v. Reynolds Elec. & Eng'g Co., Inc. (9th Cir. 1973), 471 F.2d 1157 (same result with oil rig drilling superintendents); Topel v. Northern Virginia Sun, Inc. (E.D.Va. 1973), 22 Wage & Hour Cas. (BNA) 315, 77 Lab. Cas. (CCH) ¶ 33,274 (same result with working foreman at typesetting department of a newspaper), aff'd, 22 Wage & Hour Cas. (BNA) 318, 77 Lab. Cas. (CCH) ¶ 33,275; Wirtz v. Arcata Plywood Corp. (E.D.Cal. 1969), 59 Lab. Cas. (CCH) ¶ 32,131 (same result with supervisor of a data processing department of plywood factory)).

¶ Close oversight of the food preparation process is crucial to producing a recognizable, standardized national fast food product. Therefore, it is justifiable to conclude that fast food managers are exempt even though they do not exercise substantial managerial discretion and work alongside non-exempt employees a majority of their time. However, it is one thing to analogize the operation of a franchise fast food restaurant to the assembly line paradigm, but it is quite another to apply that same rationale to the operation of the Yellowstone Mine Restaurant.

¶ To illustrate, the managers in Burger King had a variety of "powers and responsibilities" that were largely dictated by "detailed instructions" issued by Burger King's central corporate office. On appeal, the Secretary of Labor did not dispute the existence of these powers and responsibilities, but contended that they were "wholly dictated by the detailed instructions issued by Burger King," and, therefore, that the managers did not exercise sufficient discretionary powers to be considered executive exempt employees. Burger King, 675 F.2d at 521. The Second Circuit Court of Appeals disposed of the Secretary's contentions as follows:

> We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different locations and that adherence by Assistant Managers to a remarkably detailed

> routine is critical to commercial success. . . . In the competitive, low margin circumstances of this business, . . . an undirected or unsupervised work force . . . can make the difference between commercial success and failure. [Emphasis added.]

Burger King, 675 F.2d at 521-22. Thus, the court concluded that the third factor of 29 C.F.R. § 541.103, the frequency with which the employee exercises discretionary powers, was satisfied.

¶ **The Second Circuit further concluded that since Burger King managers were "solely in charge of their restaurants" for a majority of their working time, the fourth factor of 29 C.F.R. § 541.103, the employee's relative freedom from supervision, was satisfied. Burger King, 675 F.2d at 522. In reaching this conclusion, the court again relied upon a number of earlier cases in the industrial context which had similarly concluded that an employee in charge of a functional department or subdivision of a larger business organization could be found to be operating with a "relative" lack of supervision, despite the fact that he or she performed largely routinized work. See Burger King, 675 F.2d at 522 (citing Walling, supra; Phillips v. Federal Cartridge Corp. (D.Minn. 1947), 69 F.Supp. 522 (holding that employees who performed largely routine tasks but were in charge of a functional department of an industrial plant employing as many as 26,000 workers were exempt); Kelly v. Adroit, Inc. (E.D.Tenn. 1979), 480 F.Supp. 392 (holding that a working foreman's primary duty in supervising a subdivision of an industrial plant was managerial even though he performed substantial non-managerial work)).**

¶ **Under the federal regulations, "where an enterprise comprises more than one establishment, the employee in charge of each establishment may be considered in charge of a subdivision of the enterprise." 29 C.F.R. § 541.104(b). The regulations clearly contemplate the organizational complexity of many modern business enterprises, and seek to permit exempt status for employees who are in charge of a customarily recognized department or subdivision of a larger, stratified business entity. The economic fact that many modern business organizations are divided both hierarchically and functionally into specialized units does not mean that such employers should be denied the opportunity to have an executive exempt employee in charge of each department or subdivision of the greater entity. This may be true even where the employee's discretion to act in a managerial capacity is largely circumscribed by detailed procedures dictated from above or where the employee**

**performs non-managerial work a majority of the time.**

**¶ For these reasons, case law interpreting 29 C.F.R. § 541.103, has consistently found exempt status for "short test" managers in modern, multi-store business operations. See, e.g., Glefke v. K.F.C. Take Home Food Co. (E.D.Mich. 1993), 1 Wage & Hour Cas. 2d (BNA) 1080 (unreported opinion and order) (fast food chain); Murray v. Stuckey's, Inc. (8th Cir. 1991), 939 F.2d 614 (convenience store chain); Horne v. Crown Cent. Petroleum, Inc. (D.S.C. 1991), 775 F.Supp. 189 (convenience store chain); Russell v. Mini Mart, Inc. (D.Mont. 1988), 711 F.Supp. 556 (convenience store chain); Donovan v. Burger King Corp. (1st Cir. 1982), 672 F.2d 221 (fast food chain).**

**¶ Put simply, "the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity." Murray, 939 F.2d at 619. However, the same cannot be so easily said of the Yellowstone Mine Restaurant, a solitary business establishment where the same concerns for standardization and uniformity are not present and where the owner, Kemp, retained authority over most significant managerial decisions.**

**¶ The Department was well aware of this factual distinction, and took pains to distinguish the Burger King decision from the facts of the instant case. First, the Department made careful factual findings, quoted earlier, showing that Showers did not exercise managerial control over the entire business operations of the Yellowstone Mine Restaurant, but only over the kitchen. Additionally, as the findings chronicle, Showers did not exercise exclusive supervisory control over kitchen staff for much of the relevant claim period even though she viewed herself as being "in charge" of the kitchen. Second, and following logically from the findings, the Department concluded that Burger King and its progeny were factually distinguishable from this case because Showers "was not in charge" of the entire "unit or business" at issue, but only "worked in [the] kitchen" of the Yellowstone Mine Restaurant. The Department was correct. I dissent.**

/S/ WILLIAM E. HUNT, SR.

Justices Terry N. Trieweiler and Jim Regnier concur in the foregoing dissent.

No

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER